## IN THE MATTER OF ARTHUR LAWRENCE ABRAMS, AN ATTORNEY AT LAW.

Argued February 19, 1974—Decided June 4, 1974.

*Mr. Frederick C. Vonhof* for the order.

*Mr. Clive S. Cummis* argued the cause for the respondent (*Messrs. Sills, Beck, Cummis, Radin and Tischman,* attorneys; *Mr. Jeffrey Barton Cahn* and *Mr. Jerald D. Baranoff,* on the brief).

PER CURIAM. The Essex County Ethics Committee charged the respondent with ethical violations in a presentment dated

May 16, 1973, later modified in a supplemental report dated December 13, 1973.

In 1967 the respondent became aware, through C. B. Snyder, a business associate and real estate broker, of the impending sale of Jersey City waterfront property which was suitable for transformation into a port facility. He communicated with his client Ezra Sensibar, President of Construction Aggregates Corporation, which specializes in the building and operation of port facilities. Thereafter the ESCA Corporation was formed to bid on the Jersey City property. The respective ownership interests in ESCA were Construction Aggregates Corporation 60%, Snyder 20% and respondent 20%. An auction of the property was held in Jersey City on August 1, 1967 and ESCA was the successful bidder for the sum of $2,040,000. The property was isolated from city services and it was necessary that water and sewer facilities as well as access roads be provided. A meeting was arranged with John V. Kenny, the then Hudson County political leader, who assured Sensibar that there would be wholehearted official cooperation in the development of the port facility proposed by ESCA.

Towards the close of 1968 Jersey City adopted resolutions letting contracts for the construction of roads and the laying of sewer and water pipes to the property acquired by ESCA. At about the same time, a resolution was adopted authorizing payment of a 5% brokerage commission to C. B. Snyder Realty, Inc. The commission amounted to $102,000 and half, namely, $51,000, was paid to the respondent pursuant to an earlier arrangement between Snyder and the respondent. The respondent testified that although the $51,000 was his to do with as he pleased, he considered that he should ethically turn it over to ESCA. He did that by placing it in an "Arthur Lawrence Abrams Trust Account" in the National Newark and Essex Bank; at one point he described the $51,000 in the trust account as "an emergency fund."

As time went on and as the financial commitments of ESCA (renamed Port Jersey Corporation) and those asso-

ciated with it became deeper and deeper, the lack of coopera-
tion by the Jersey City officials became evident. Despite the
resolutions letting contracts for the construction of roads and
the laying of sewer and water pipes, work had not been com-
menced and permits had not been issued when the respondent
and Snyder were advised that a so-called "political contribu-
tion" was expected by the Jersey City officials. It was sug-
gested that Sensibar should see Flaherty, then President of
the Jersey City Council. The respondent testified that he
called Sensibar who said "leave it to me." Sensibar testified
that when he met with Flaherty on April 19, 1969 he knew
that the money that had already been invested "would all
go down the drain if we didn't somehow make peace and get
quick cooperation from City Hall." He was disposed to make
"a campaign contribution" of $20,000 in cash "to get that
peace." He testified further that after his April 19 meeting
with Flaherty he conferred with Snyder and the respondent
and "they both said that it was unrealistic to expect that we
could do as much construction work, as much business as we
were doing in Hudson County without acceding to a shake-
down of some kind. They thought that $20,000 in the circum-
stances might be nominal and they urged that I should
arrange for us to pay it." Under date of April 22, 1969 the
respondent issued a check in the sum of $20,000 on his trust
account. The check was made payable to Construction Ag-
gregates Corporation and was stated on its face to be "For
Engineering Services." The respondent sent the check to
Sensibar who cashed it and who arranged to have the
$20,000 in cash delivered to Flaherty.

The presentment embodied the following findings with re-
spect to the $20,000 payment: "Respondent characterizes
such payment as extortion and the city officials as extortion-
ers and what has transpired would so indicate, however, re-
spondent was a participant and it was through the trust
funds in his possession that such payment was made. Respon-
dent was well aware of the reasons underlying the making of
such payments. Though respondent owed a duty to his client

to act zealously in its behalf and for its best interests, and to make disbursements from the trust fund as it directed, nevertheless respondent was under an obligation to act within the bounds of the law, and obey his own conscience. Direct participation is denied by respondent, however, he was the conduit through whom such payments were made, and to that extent he did participate in the transaction."

In October 1970 Mr. MacMillan, Vice President of Port Jersey, told the respondent that several months earlier he "had a problem with a building permit" and had paid out the sum of $1200. He requested a check for the $1200 from the respondent's trust account but by that time the funds in the trust account had apparently been transferred to a certificate of deposit in the National Newark and Essex Bank in the name of Port Jersey. In response to MacMillan's request the respondent arranged in effect for the bank to issue its check dated October 7, 1970 in the sum of $1200 payable to Port Jersey. The respondent testified that he did not learn until much later that the $1200 represented "a payoff to the building department of Jersey City." In the presentment the Committee made no specific factual finding in this regard although in its supplemental report, after referring to both the $20,000 payment and the $1200 payment, it said: "The total testimony reflects respondent's knowledge that the enterprise of which he was one of the principals, as well as its legal counsel, was compelled to pay $21,200 to certain public officials in aid of the furtherance of the development of the project."

In the presentment the Committee found that $3,860 had been paid from the respondent's trust funds to Frank Murray, President of the Jersey City Local of the International Longshoremen's Association, in violation of *N. J. S. A.* 2A: 93-7. However, in the supplemental report this finding has been withdrawn. The Committee was satisfied on the basis of further testimony submitted to it, "that there was no impropriety on the respondent's part in participating" in the payment to Murray. The presentment also contained a find-

ing that the sharing of the brokerage commission in the manner described was violative of *N. J. S. A.* 40:60–26(d) — since repealed by *L.* 1971, *c.* 199, § 29. However we gather from the supplemental report that this finding has also been withdrawn by the Committee.

The supplemental report reiterated the Committee's earlier finding "that the respondent knowingly was a conduit in the furtherance of illegal payments to public officials." It rejected the respondent's contention that he had no alternative but to comply with Sensibar's request that he turn over $20,000 from the trust funds so that it could be used to satisfy the extortionate demands of the city officials. It suggested that the respondent might have instituted legal proceedings to obtain the required official action, that he might have reported the matter then or in due time thereafter to the State or other duly constituted law enforcement officials, or that he might have in timely fashion withdrawn completely from the matter. In any event the Committee was firm in its opinion that the respondent's ethical duties were not to be measured simply by the "legality or illegality of his client's acts" and that compliance with the client's demands "for moneys in the lawyer's possession under the circumstances of this case is not a full discharge of the lawyer's ethical obligation."

The Committee stated that it reached its conclusions "with regret because the record in this case and the personal knowledge of the members of the Committee establishes beyond question that respondent's performance as a man and as a member of the Bar of this State over the years is a record not only of outstanding accomplishments but also of dedication to the highest ideals of the legal profession. He interrupted his legal career to serve in the Armed Forces. When he returned to civilian life and the practice of law he devoted much of his time and strength to the service of the members of the Bar and the students of the law; he has taken an active part in bar association activities; he is a former chairman of this Committee; he has taught law and

he has assisted other teachers of the law in working on drafts of uniform laws."

We do not consider that either the payment to Murray or the sharing of the brokerage commission is now before us. And we are not satisfied that the record is sufficient to establish participation by the respondent in the $1,200 payment to Jersey City's building department. However we consider that the respondent's knowing participation in the $20,000 payment to the Jersey City officials was firmly established. The purposes surrounding the original creation of the trust fund is nowhere unequivocally acknowledged though the Committee in its presentment concluded that the "$51,000 retained in respondent's possession in a trust account that contained only Port Jersey money was used by Port Jersey to make irregular payments which would not be reflected upon the corporate books of Port Jersey." Be that as it may there is no basis for doubting that the respondent was fully aware that the $20,000 check drawn by him from the trust funds in his possession and turned over by him to Sensibar was to be cashed and the cash to be used to satisfy the illegal extortionate demands of the Jersey City officials. The respondent also was fully aware that the $20,000 was not "For Engineering Services" as the face of the check drawn by him set forth; the fact that Sensibar's company may then have been owed moneys for engineering services was immaterial since the $20,000 was not actually intended or disbursed as payment for its engineering services.

Little regard need be paid to the "political contribution" cover by the Jersey City officials. They well knew that their demand was a corrupt one involving extortion or bribery or both. See *In re Colsey,* 63 *N. J.* 210, 211 (1973) ; *cf. N. J. S. A.* 2A:105–1; *N. J. S. A.* 2A:93–6; *State v. Begyn,* 34 *N. J.* 35, 45–49 (1961); *State v. Seaman,* 114 *N. J. Super.* 19, 31 *(App. Div.)*, certif. denied, 58 *N. J.* 594 (1971), cert. denied, 404 *U. S.* 1015, 92 S. Ct. 674, 30 *L. Ed.* 2d 662 (1972). Similarly all of the parties including the respondent well knew the illegal nature of the demand and that

"the payment would be corrupt." *In re Colsey, supra,* 63 *N. J.* at 211. It may be assumed, as the respondent asserts, that here there was extortion rather than bribery and that Port Jersey was the victim rather than the movant. But, as was pointed out in *Colsey,* "with respect to the ethics charge, it would be no defense that respondent's conduct, if unethical, related to 'extortion' rather than 'bribery' ". 63 *N. J.* at 211 n. 1.

It is urged before us that Sensibar should be viewed simply as an unwilling victim who bowed to extortionate demands and as such is not subject to charges of criminality or illegality. But we are not here concerned with the consequences of his conduct to Sensibar. We are concerned with the respondent, a member of the bar who, apart from his financial interest in the venture, was acting as legal counsel and was bound by the high ethical principles of his profession. Those principles clearly dictated that he play no part whatever in the corrupt $20,000 payment to the public officials of Jersey City. We are entirely satisfied that the respondent's participation in the corrupt payment, to the extent described earlier in this *per curiam,* was unethical and calls for some measure of discipline.

In *Colsey* (63 *N. J.* 210) an attorney was disbarred for knowingly participating in a transaction which involved a corrupt payment to satisfy an illegal demand by a public official. However, unlike the situation here, the attorney was not in any sense a covictim, played a very active part in the corrupt transaction itself and "used the fact that he was a member of the bar as part of the mask for the crime by creating the appearance that a professional fee was involved." 63 *N. J.* at 215. We agree with the position of respondent's counsel that *Colsey* is distinguishable and that disbarment is not called for. But we disagree that "discipline which exceeds reprimand" would be excessive. Reprimand may sometimes be appropriate where there has been a lesser ethical violation not involving corrupt conduct as in *In re Kamp,* 40 *N. J.* 588 (1963) and *In re Abrams,* 56

N. J. 271 (1970). See also *In re A. and B.*, 44 *N. J.* 331 (1965). But where, as here, there has been knowing participation in corrupt conduct it would not be at all appropriate and would not represent a responsible discharge of the unfortunately necessary duty placed upon us by Article VI, section 2, paragraph 3 of our Constitution. Though the original creation of the trust fund itself by the respondent was suspect, the record does not permit a finding that it was specifically designed for the illegal payment. But the record does permit and indeed compels a finding that the respondent not only permitted its use for the illegal payment but knowingly participated in the illegal payment itself by drawing the check and misstating on its face that it was for engineering services. Indeed in the light of Sensibar's testimony we are led to the finding that the respondent did not resist the payment but on the contrary supported it. Surely it must be recognized that such conduct was grossly inimical to the ever-present hope of the elimination of official corruption and the maintenance of high standards in the legal profession.

▮ The determination as to the measure of discipline is difficult and, as we have repeatedly pointed out, "each case must rest largely upon its own particular circumstances." *In re Greenberg*, 21 *N. J.* 213, 225 (1956); *In re Baron*, 25 *N. J.* 445, 449 (1957). We have given due consideration to all of the interests involved and the mitigating factors which appear in the record and are set forth by the Committee in its presentment and supplemental report. We have concluded that the respondent's professional dereliction warrants suspension from the practice of law for a period of one year and until further order; judgment to that effect will be entered.

*For suspension*—Justices JACOBS, HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—6.