**In the Matter of Arthur Lawrence ABRAMS, an Attorney-at-Law, Appellant.**

**No. 75–1029.**

United States Court of Appeals, Third Circuit.

Argued May 8, 1975.

Decided June 30, 1975.

Certiorari Denied Dec. 15, 1975. See 96 S.Ct. 574.

Sills, Beck, Cummis, Radin & Tischman, Clive S. Cummis, Newark, N.J., of counsel; Jerald D. Baranoff, Newark, N.J., on the brief, for appellant.

Clyde A. Szuch, Pitney, Hardin & Kipp, Newark, N.J., for New Jersey State Bar Association, amicus curiae.

Jonathan L. Goldstein, U.S. Atty., John J. Barry, Maryanne T. Desmond, Asst. U.S. Attys., Newark, N.J., on the brief, for appellee.

William J. Brennan, III, Smith, Stratton, Wise & Heher, Co-Chairmen, Ethics Committee, Princeton, N.J., Thomas F. Campion, Co-Chairman, Ethics Committee, Newark, N.J., for amicus curiae, Federal Bar Assn. (Newark Chapter).

Before SEITZ, Chief Judge, VAN DUSEN, ALDISERT, ADAMS, ROSENN, HUNTER and WEIS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Arthur Lawrence Abrams appeals from an order of the United States District Court for the District of New Jersey disbarring him from the practice of law in that court. The circumstances giving rise to this litigation relate to Abrams' issuance of a check, drawn on a trust account and ultimately used to satisfy the extortion of Jersey City officials. The Supreme Court of New Jersey ordered his suspension from the practice of law for one year. *In re Abrams,* 65 N.J. 172, 320 A.2d 471 (1974). Acting on the same evidentiary material, and without conducting a separate evidentiary hearing, the district court entered its order.[1] The question presented

---

1.               ORDER

For the reasons stated, it is hereby ordered that the name of Arthur Lawrence Abrams be, and the same hereby is, stricken from the roll of attorneys permitted to practice before this Court, and until the further order of the Court.

for review is the propriety of the district court's action.

## I.

Although the facts relevant to the charge against Abrams are not in dispute, we will accept the statement of facts presented in the United States Attorney's brief defending the action of the district court:

> The order appealed from had its genesis in an investigation conducted by the New Jersey State Commission of Investigation ("SCI"). In August 1971, appellant, Arthur Lawrence Abrams, and his client Ezra Sensibar refused, on the basis of the Fifth Amendment, to answer certain questions propounded by the SCI. Thereafter, formal immunity was conferred upon them and their subsequent public testimony in October 1971 formed the predicate for the filing of formal charges against Abrams by the Essex County Ethics Committee. At Abrams' specific request, his testimony and that of Sensibar was made part of the record of the ensuing disciplinary proceeding. Although several charges were initially filed against Abrams, only one charge is now relevant. That charge was as follows:

> On April 22, 1969, by check bearing that date drawn on his trust account in the National Newark and Essex Bank, in Newark, respondent did pay to Construction Aggregates Corporation the sum of $20,000 allegedly for engineering services which sum respondent well knew would be used by said corporation, or an officer thereof, for an illegal and improper purpose contrary to and in violation of N.J.S. 2A:93–6 as a bribe to and to satisfy the extortionate demands of certain public officials of the City of Jersey City.

The facts relevant to that charge are set forth below.

In 1967, appellant became aware through Clinton B. Snyder, a Jersey City real estate broker, of the impending sale of Jersey City waterfront property. Appellant communicated this information to Ezra Sensibar, president of Construction Aggregates Corporation, a firm which specialized in the construction and operation of port facilities. Thereafter, appellant, Snyder and Sensibar formed the E.S.C.A. Corporation (later renamed the Port Jersey Corporation and hereinafter referred to as "Port Jersey") to bid on the Jersey City waterfront property. The respective ownership interests in Port Jersey were: Construction Aggregates Corporation 60%, Snyder 20% and appellant 20%. On August 1, 1967, the waterfront property was auctioned and Port Jersey was the successful bidder, having bid $2,040,000.

The waterfront property was essentially a swamp. In addition, it was isolated from city services, such as water and sewerage, and could not be easily reached due to the lack of access roads. In order to develop the property as a port facility, it was necessary in the judgment of the principals of Port Jersey to secure cooperation from the City of Jersey City in the form of construction of access roads and water and sewerage lines to the property and the providing of favorable tax treatment. At the time Port Jersey successfully bid on the property, the City of Jersey City had not announced that it was committing itself to furnish the various forms of cooperation Abrams and his co-venturers deemed essential.

Shortly after the auction, a meeting was arranged by Sensibar to obtain the necessary cooperation. The meeting was held at the offices of Comparetto and Kenny, a local architectural and engineering firm, and was attended by John V. Kenny [*de facto* political leader of Hudson County], Sensibar and Snyder. At the meeting, Sensibar told John V.

---

*In re Abrams,* 385 F.Supp. 1210, 1212 (D.N.J. 1974). Although the last clause renders the order susceptible to the interpretation that the court ordered something less than a final dis-

barment, the parties have treated this case as one of disbarment. Accordingly, we also will treat the order as a disbarment.

Kenny that Port Jersey would need many forms of cooperation from the City of Jersey City in order to make the development of the port facility possible. Kenny agreed to furnish the cooperation requested and told Sensibar that, if anybody asked him for money, he, Sensibar, should come to him, Kenny, and he would take care of it. After being assured of cooperation, Sensibar asked Kenny whether there were any local people who should be taken into the venture. Kenny responded that he would appreciate Port Jersey's employing Comparetto and Kenny as its architect. Abrams was out of town at the time of the meeting but was subsequently advised by Sensibar and Snyder as to what had transpired at the meeting.

Port Jersey thereafter decided to retain Comparetto and Kenny as its architect because of John V. Kenny's suggestion and because they were "well regarded, well connected locally." Abrams negotiated the contractual terms and drafted the contract, which was entered into in December 1967.

In March of 1968, Abrams and Sensibar met with Mayor Whelan and City Council President Flaherty at a party at the New York Athletic Club and Abrams explained to these officials the various forms of cooperation which Port Jersey would require. No commitment was made at that time to furnish the cooperation requested. Thereafter, Abrams negotiated a contract with the City of Jersey City in which the City agreed to construct the necessary access roads and to lay water and sewerage lines to the property.

Title to the property did not pass until November 21, 1968. During the period intervening between the successful bid and the closing on the property, appellant, in addition to the negotiations described above had negotiated certain purchases of adjoining properties in or-der to resolve potential title problems and had also negotiated a $6,000,000 development loan.

Following the closing of title, the city council of Jersey City adopted various resolutions providing for the furnishing of the access roads, water and sewerage lines. In addition, the city council adopted a resolution authorizing the payment of a 5% brokerage commission to the C. B. Snyder Realty Company, a firm in which Snyder had a one-third interest. No provision had been made for the payment of the commission, which amounted to $102,000, either in the bid specifications, announced when the property was auctioned, or in the closing documents which were executed when title passed.

Upon receipt of the $102,000 in January 1969, Snyder paid Abrams half, pursuant to an oral arrangement entered into between them at some earlier date. Abrams deposited the $51,000 he received in a special account, denominated the Arthur Lawrence Abrams Trust Account. This money remained in the trust account for more than two years and was ultimately utilized in part to make a $20,000 payment to the president of the Jersey City council.[2]

In late January or early February 1969, Abrams attended a luncheon with Snyder and Bernard Kenny at the Downtown Club in Newark. At that time, Kenny stated that the "organization", which appellant took to mean the Hudson County Democratic Organization, wanted a percentage of the construction costs of the port facility in cash. At that time, the estimated cost of construction of the projected port facility was somewhere between fifty and one hundred million dollars. When this demand was made, Abrams didn't think it was necessary to ask Kenny any details nor did Kenny think it was necessary to tell appellant any details. Kenny

---

2. Of this transaction, the state court noted:

The respondent testified that although the $51,000 was his to do with as he pleased, he considered that he should ethically turn it over to ESCA [Port Jersey]. He did that by placing it in an "Arthur Lawrence Abrams Trust Account" in the National Newark and Essex Bank; at one point he described the $51,000 in the trust account as "an emergency fund." 65 N.J. at 173, 320 A.2d at 472.

did not threaten but did indicate that, in the absence of payment, Port Jersey would experience difficulties. Abrams did not argue with Kenny or discuss the matter further with him.

Following the meeting, Abrams telephoned Sensibar in Chicago and was told by Sensibar that he, Sensibar, would take care of it. Thereafter, Sensibar met with Flaherty in New York. He told Flaherty that he was getting complaints about a lack of cooperation and reminded Flaherty of his, Sensibar's, original discussion with John V. Kenny and the promise of cooperation. Flaherty said that he knew about that discussion but that the organization needed money. He suggested to Sensibar that Port Jersey contribute 3% of the cost of construction. Sensibar refused and the meeting ended.

A couple of weeks later, Sensibar arranged a meeting with John V. Kenny. He told Kenny of Flaherty's demand and reminded him of their earlier discussion. Kenny responded by telling Sensibar that he remembered the discussion and would stand by it but that a campaign contribution would be appreciated because the organization had an expensive campaign. Sensibar did not respond and the meeting ended. Sensibar returned to Chicago "with the intention that we would not make any substantial contribution".

In early April, Abrams, Snyder and Bernard Kenny told Sensibar they were stymied at city hall and suggested that he, Sensibar, have another meeting with Flaherty. A meeting was held in Flaherty's office on April 19 between Sensibar and Flaherty. At that meeting, Flaherty told Sensibar that he, Flaherty, needed $140,000 to finance the balance of the campaign and that he had to go to a few large contributors to get the money. He also told Sensibar that the proposal he, Flaherty, had made before was unrealistic and he was now willing to come down to 1% of construction costs as a contribution. Sensibar offered a contribution of $10,000, and, after discussion, Sensibar and Flaherty agreed to the making of a $20,000 contribution.

After this meeting with Flaherty, Sensibar consulted with Abrams and Snyder, who both told him "that it was unrealistic to expect that we could do as much construction work, as much business as we were doing in Hudson County without acceding to a shakedown of some kind. They [Abrams and Snyder] thought that $20,000 in the circumstances might be nominal and they urged that I should arrange for us to pay it".

Thereafter, Abrams issued a $20,000 check on the Arthur Lawrence Abrams Trust Account at Sensibar's request for the purpose of enabling Sensibar to obtain the $20,000 in cash he had agreed to pay to Flaherty. At Sensibar's instruction, Abrams falsely represented on the face of the check that it was issued in payment "For Engineering Services". Thereafter, Sensibar sent Abrams a false invoice reflecting a $20,000 charge for engineering services. Sensibar cashed the check and delivered the cash to Snyder, who in turn delivered it to Flaherty. Afterwards, Port Jersey received cooperation from the City in regards to sewerage, water, access roads and favorable tax treatment.

U.S. Attorney's Brief at 4–9 (footnotes and appendix references omitted).

In 1973, the Essex County Ethics Committee charged Abrams with various ethical violations stemming from his activities for Port Jersey. In reviewing those charges, however, the New Jersey Supreme Court concerned itself only with Abrams' "knowing participation in the $20,000 payment to the Jersey City officials." *In re Abrams, supra,* 65 N.J. at 177, 320 A.2d at 474. After detailing the factual circumstances which spawned the allegations of impropriety, the state court stated:

> We are concerned with the respondent, a member of the bar who, apart from his financial interest in the venture, was acting as legal counsel and was bound by the high ethical principles of his profession. Those principles clearly dictated that he play no part whatever in the corrupt $20,000 payment to the public officials of Jersey City. We are entirely satisfied that that respon-

dent's participation in the corrupt payment . . . was unethical and calls for some measure of discipline. . . . We agree with the position of respondent's counsel that . . . disbarment is not called for. But we disagree that "discipline which exceeds reprimand" would be excessive. . . .

The determination as to the measure of discipline is difficult and, as we have repeatedly pointed out, "each case must rest largely upon its own particular circumstances." . . . We have concluded that the respondent's professional dereliction warrants suspension from the practice of law for a period of one year and until further order; judgment to that effect will be entered.

*Ibid.* at 178–79, 320 A.2d at 474–75.

## II.

Preliminarily we emphasize that which is before us and that which is not. We are not to decide Abrams' right to practice in this court. We are not in the position of the United States Supreme Court reviewing a disciplinary action imposed by a state court or determining one's right to continue to practice in that Court. We are to decide if reversible error was committed when the district court, under the circumstances of this case, barred Abrams from practicing in that court after the state court had imposed only a one-year suspension.

■ We agree totally with the United States Attorney that the starting point for analysis is the unquestioned principle that the District Court of New Jersey, like all federal courts, has the power both to prescribe requirements for admission to practice before that court and to discipline attorneys who have been admitted to practice before that court. *Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 512, 22 L.Ed. 205 (1873); *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 378–79, 18 L.Ed.366 (1866); *Ex parte Secombe,* 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1859); *Rodgers v. United States Steel Corp.,* 508 F.2d 152, 163 (3d Cir. 1975); *see* U.S.

Const. Art. III, § 1; 28 U.S.C. § 2071; Rule 83, F.R.Civ.P.

From the earliest days of this nation, the power has been recognized as broad. *See In re Ruffalo,* 390 U.S. 544, 547, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Theard v. United States,* 354 U.S. 278, 281, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); *Ex parte Secombe, supra,* 60 U.S. at 13; *Ex parte Burr,* 22 U.S. 529, 6 L.Ed. 152 (1824). However, its exercise is not without limits. As Chief Justice Marshall wrote, a balance must be struck:

> On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion, ought to reside in the court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised; and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the court itself.

*Ex parte Burr, supra,* 22 U.S. at 529–30.

■ Although a disbarment proceeding is not criminal in nature, it has consequences which remove it from the ordinary run of civil case. *Konigsberg v. State Bar,* 353 U.S. 252, 257, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957); *see Anonymous v. Association of the Bar,* 515 F.2d 427 (2d Cir. 1975). "Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer. *Ex parte Garland,* 4 Wall. 333, 380, [18 L.Ed. 366]; *Spevack v. Klein,* 385 U.S. 511, 515, [87 S.Ct. 625, 17 L.Ed.2d 574]." *In re Ruffalo, supra,* 390 U.S. at 550, 88 S.Ct. at 1226.

In striking the appropriate balance, the district courts must not operate in a vacuum. If the disciplinary proceedings derive from state court action, federal

courts are not totally free to ignore the original state proceedings:

> If the accusation rests on disbarment by a state court, such determination of course brings title deeds of high respect. But it is not conclusively binding on the federal courts. The recognition that must be accorded such a state judgment and the extent of the responsibility that remains in the federal judiciary were authoritatively expounded in *Selling v. Radford,* 243 U.S. 46, [87 S.Ct. 377, 61 L.Ed. 585]. The short of it is that disbarment by federal courts does not automatically flow from disbarment by state courts. Of the conditions that qualify such a state court judgment, the one here relevant is that some "grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under the principles of right and justice, we were constrained so to do." *Id.,* at 51, [37 S.Ct. 377].

*Theard v. United States, supra,* 354 U.S. at 282, 77 S.Ct. at 1276.

### III.

Our task is one which is "always painful", involving as it does a "proceeding for disbarment of a lawyer."[3] But it is also more, for the district court's perma-

nent termination of Abrams' right to practice his profession in the New Jersey district court constitutes a substantially more drastic penalty than that first imposed by the state court. Thus, sensitive personal, institutional and societal interests quickly surface and compete with one another.

These separate interests clamor for vindication, and they do so in a jural environment that is fraught with tension and devoid of decisional and precedential guideposts. The United States Attorney suggests that *In re Fleck,* 419 F.2d 1040 (6th Cir. 1969), *cert. denied,* 397 U.S. 1074, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1970), comes close. We disagree and find little guidance from *Fleck.* There the state court suspended the lawyers indefinitely; thereafter the district court disbarred them. We are not at all certain that a substantial difference exists between indefinite suspension and disbarment of a lawyer.[4] Thus, in Roscoe Pound's phrase, the "body of authoritative materials" relevant to our inquiry gives general, but not specific, guidance. There are no "precepts attaching a definite detailed legal consequence to a definite, detailed state of facts"; at best, we have only some "authoritative starting points for legal reasoning."[5]

Supplied only with "authoritative starting points of legal reasoning" distilled from the Supreme Court teachings,

---

**3.** *Theard v. United States, supra,* 354 U.S. at 279, 77 S.Ct. at 1275 (Frankfurter, J.).

**4.** This is made abundantly clear in *In re Fleck,* 419 F.2d at 1041, in the appendix setting forth the district court's opinion:

> This matter is before the Court pursuant to an order that respondents show cause why they should not be disbarred from the practice of law in this Court. The respondents were indefinitely suspended from the practice of law in Ohio on December 6, 1961. (*Cleveland Bar Association v. Fleck et al.,* 172 Ohio St. 467, 178 N.E.2d 782.) On June 15, 1962 respondents were suspended forthwith from the practice of law in this Court, and pursuant to Rule 1(E) of the Rules of this Court respondents were ordered to show cause why they should not *also be disbarred from practice in this court.* Rule 1(E) provides in part:

> "*Disbarment and discipline.* Any member of the bar of this court may for good cause shown and after an opportunity has been given him to be heard, be disbarred, *suspended from practice for a definite time,* reprimanded, or subjected to such other discipline as the court may deem proper."

(Emphasis supplied).

It appears that the district court rule contemplated suspension "for a definite time." Because the Ohio state court had "indefinitely suspended" the attorneys, the district court ordered them to show cause "why they should not also be disbarred from practice in this court."

**5.** Pound, *Hierarchy of Sources and Forms in Different Systems of Law,* 7 Tul.L.Rev. 475, 476, 482, 483 (1933).

we perceive our role in reviewing the district court's action to be extremely limited:

■ (1) To recognize and reinforce an absolute and unfettered power of the district court to admit and to discipline members of its bar independently of and separately from admission and disciplinary procedures of (a) the state courts and (b) this court.

■ (2) To recognize that the absolute and unfettered power of the district court to admit or reject applications for admissions will be circumscribed to the extent the district court depends upon the state court system for eligibility requirements. Thus, all other things being equal, if a district court by rule derivatively admits to its bar those admitted to the state bar, the district court may not arbitrarily deny admission to one who is a member in good standing of the state bar.

■ (3) To recognize that an absolute and unfettered power of the district court to discipline lawyers may be circumscribed to the extent the district court, in imposing its disciplinary sanc-

tions, relies upon a state's legal or factual determinations. Stated otherwise, the district court's action may be circumscribed to the extent it depends in whole or in part on a state's actions, either for the commencement of the disciplinary proceedings or for a stated basis in the determination of the sanction imposed.

### IV.

We now turn to the application of these guidelines to the case at hand.

Initially, we observe the district court's basis for admitting Abrams to its bar: "Abrams is a member of the bar of this Court by derivative admission on motion, by virtue of his status as an attorney licensed to practice by the Supreme Court of New Jersey. Local Rule 4." 385 F.Supp. at 1212. Thus, the district court has sacrificed some of its total independence of the state court system with respect to its admission procedures.[6]

The majority opinion for the divided district court described the disciplinary proceedings under Local Rule 7.[7] In its

---

6. Rule 4 of the United States District Court for the District of New Jersey provides in part:

  A. The bar of this court shall consist of those persons heretofore admitted to practice in this court and those who may hereafter be admitted in accordance with these rules.

  B. Any attorney licensed to practice by the Supreme Court of New Jersey may be admitted as an attorney at law on motion of a member of the bar of this court, made in open court, and upon taking the prescribed oath and signing the roll.

  C. Any member in good standing of the bar of any court of the United States or of the highest court of any state, who is not eligible for admission to the bar of this court under subdivision B of this rule, may in the discretion of the court, on motion, be permitted to appear and participate in a particular case; provided, however, that such appearances and participation in civil actions, individually or by a law firm of which said attorney is a member or associate, shall be limited to not more than three actions in any calendar year. . . .

7. Rule 7 of the United States District Court for the District of New Jersey provides, in part:

  (1) The chief judge shall have charge of all matters relating to the discipline of members of the bar.

  (2) The court may make an order in a disciplinary proceeding disbarring, suspending or censuring, or taking such other action as justice may require, with respect to a member of the bar of this court:

    (a) Who has resigned from the bar of a court of any State, Territory, District, Commonwealth or Possession.

    (b) Who has been disbarred, suspended from practice or censured in any State, Territory, District, Commonwealth or Possession;

    (c) Who has been convicted of a crime involving moral turpitude in any State, Territory, District, Commonwealth or Possession; or

    (d) Who is guilty of conduct unbecoming a member of the bar of this court. Without limiting the generality of the foregoing, such misconduct shall be deemed to include fraud, deceit, malpractice, conduct prejudicial to the administration of justice, or violation of the Canons of Professional Ethics of the American Bar Association.

  (3) Proceedings within subdivisions (a), (b), and (c) of Paragraph 2 may be initiated by an

statement of reasons, the district court acknowledged a responsibility to the New Jersey state court system, implicitly incorporating the statement of "facts. and circumstances" set forth in the opinion of the New Jersey Supreme Court. *See* 385 F.Supp. at 1211. Thus, the district court found no adjudicative facts on its own; instead it relied exclusively on those found by the state court. The district court then conceded:

> Ordinarily, a suspension, disbarment or censure by the Supreme Court of New Jersey will result in corresponding action here. Local Rule 7. But this accommodation does not necessarily suffice to discharge the independent obligation of this Court to take appropriate action on its own rational analysis and determination, although in doing so it will hold the greatest respect for, and give due weight and consideration to, the views of the Supreme Court. *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *In re Wilkes*, 494 F.2d 472, at 474–475 (C.A.5, 1974).

*Ibid.* at 1212.

### A.

◼ We acknowledge the right of the district court "to discharge [an] independent obligation" and to "take appropriate action on its own rational analysis and determination." We further ac-

knowledge that the "appropriate action" may be at variance with that taken by the state court system. We also acknowledge that the district court may draw inferences from "facts and circumstances" which differ from those drawn by the state. Especially do we believe that the district court may emphasize countervailing federal considerations. *Cf., e. g., Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U.S. 525, 537, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). But "appropriate action" must always embody a proper application of governing legal precepts. We conclude that the district court's action was deficient in this respect.

For "its own rational analysis and determination" the district court relied in part on a New Jersey Supreme Court decision for precedential authority for its action:

> We see no basis for distinguishing this case from *In re Colsey*, 63 N.J. 210, 306 A.2d 72 (1973). Professional misconduct, like fraud, takes many forms. Variations in detail are not significant when the underlying character is the same. A lawyer who countenances and assists client misconduct for the payment of an extortionate bribe countenances two offenses: one, the extortion and two, the bribe. His minimum duty in such circumstances is to advise the client against

order requiring the respondent to show cause within 30 days after service thereof on him, personally or by mail, why he should not be disciplined. Upon the issuance of such order the chief judge may, for good cause, temporarily suspend the respondent pending the termination of the proceedings. Upon the return of said order, if the respondent fails to appear or, if he appears and does not contest, the court shall take such action as justice may require. If the respondent appears and contests, the chief judge shall prescribe procedures to formulate the issues and to provide for a hearing in a manner similar to that set forth in Paragraph 4 hereof.

(4) Proceedings within subdivision (d) of Paragraph 2 shall be presented to the chief judge, and, if he deems the charges of professional misconduct of sufficient weight, he shall refer them for preliminary investigation and recommendation to a committee of members

of the bar of the court designated by him or to the United States Attorney. The recommendation shall be presented to the chief judge.

Thereupon, with the approval of the chief judge, the committee designated or the United States Attorney shall proceed against the defendant by a petition setting forth the charges against him and an order requiring him to file an answer and show cause within 30 days after service on him, personally or by mail, of the petition and order why he should not be disciplined. Upon respondent's answer to the petition, the chief judge may set the matter for prompt hearing before himself, or a court of one or more judges, or may appoint a master to hear and report his findings and recommendations. After such a hearing or report, or if no answer is made by the respondent, the court shall take such action as justice may require. . . .

it in the strongest terms, and if the client persists, to disassociate himself from the matter promptly and completely. And, since a communication in the course of legal service sought in aid of the commission of a crime or fraud is not privileged, N.J.Ev.Rule 26(2)(a), he may be under a further duty to report the matter to proper authorities.

385 F.Supp. at 1211–12.

■ In the context of its announced objective to "hold the greatest respect for, and give due weight and consideration to, the views of the [New Jersey] Supreme Court," the district court was not free to rely upon *Colsey* for New Jersey precedential guidance. Having elected to bottom its own rational analysis on New Jersey law, the controlling case for the district court was *In re Abrams*—not *In re Colsey*. And, in *Abrams*, the New Jersey Supreme Court explicitly concluded that *Colsey* was distinguishable:

> In *Colsey* (63 N.J. 210, 306 A.2d 72) an attorney was disbarred for knowingly participating in a transaction which involved a corrupt payment to satisfy an illegal demand by a public official. However, unlike the situation here, the attorney was not in any sense a covictim, played a very active part in the corrupt transaction itself and "used the fact that he was a member of the bar as part of the mask for the crime by creating the appearance that a professional fee was involved." 63 N.J. at 215, 306 A.2d at 75. We agree with the position of respondent's counsel that *Colsey* is distinguishable and that disbarment is not called for.

65 N.J. at 178, 320 A.2d at 475.

Whatever freedom the district court possessed independently to draw inferences from the facts and circumstances, the court could not, with fealty to consistency, disregard the interpretation of New Jersey state law by that state's highest court and at the same time profess to "hold the greatest respect for, and give due weight and consideration

to, the views of the [New Jersey] Supreme Court."

**B.**

Local Rule 7 provides for disciplinary proceedings of one who has been disbarred or suspended from practice in any state, Rule 7(2)(b), and one who is "guilty of conduct unbecoming a member of the bar of this court", Rule 7(2)(d). The rule to show cause entered against Abrams clearly was limited to Rule 7(2)(d) and 7(2)(b):

> It appearing that Arthur Lawrence Abrams may have been guilty of conduct unbecoming a member of the Bar of this court; and
>
> It further appearing that the said Arthur Lawrence Abrams was suspended from the practice of law by order of the Supreme Court of New Jersey dated June 3, 1974 . . . .

The second paragraph of the rule relates to the state proceedings in which the only charge considered was the issuance by Abrams of a check for $20,000. We agree with the United States Attorney's assertion that "[a]lthough several charges were initially filed against Abrams, only one charge [the $20,000 payment from the trust fund] is now relevant." U.S. Attorney's Brief at 4. Unfortunately, the district court did not limit its consideration to that matter. Instead, it also considered the $102,000 real estate commission shared by Abrams:

> Another factor is that Abrams accepted a share of a real estate commission paid by the City of Jersey City on the sale of property on public bid. He deposited that share in his trust account, explaining that he considered it to belong to the client, but no credible explanation was provided for the making of the payment in the first place. The commission aspect bears all the indications of a device to divert public funds into channels from which they could be repaid secretly to the public officials. Justification for its payment is not satisfactorily shown.

385 F.Supp. at 1211. Consideration by the district court of the "commission aspect" was impermissible for two reasons.

First, although the presentment of the county Ethics Committee contained a finding that the sharing of the brokerage commission violated New Jersey law, this charge was later "withdrawn by the Committee", *In re Abrams, supra,* 65 N.J. at 176, 320 A.2d at 473, and not considered by the New Jersey Supreme Court. *Ibid.* at 177, 320 A.2d at 474. Therefore, insofar as the district court disciplinary proceeding derived from New Jersey's suspension of Abrams, *see* Local Rule 7(2)(b), page 1102 n.7 *supra,* the district court could not, with propriety, rely on the "commission aspect" of the original presentment.

Second, insofar as the district court disciplinary proceeding derived from "conduct unbecoming a member of the bar" separate and apart from that considered in the New Jersey state court proceedings, the lower court was obliged to follow its own procedural rules. This it failed to do. Local Rule 7(4), page 1102 n.7 *supra,* provides that proceedings relating to "conduct unbecoming a member of the bar of this court" "shall be presented to the chief judge, and, if he deems the charges of professional misconduct of sufficient weight, he shall refer them for preliminary investigation and recommendation to a committee of members of the bar of the court designated by him or to the United States Attorney." The reference procedure was not followed; nor were the procedures governing reception of any recommendation of "the committee designated or the United States Attorney" followed.

It is argued that the failure of the district court to follow the provisions of Local Rule 7(4) can be justified because "[t]*hese things* had been done in the state proceeding which [Abrams] states were not 'wanting in due process in any

respect'. He specifically asked the District Court to decide the matter on the basis of the *entire state record.* He did not ask for further investigations which might have led to the filing of yet additional charges. He was content to avoid further proceedings then. He cannot be heard to complain now that their lack prejudiced him in any way. He was found on the basis of the record which he declined to supplement to have been guilty of the *precise misconduct originally charged* and that record overwhelmingly supports that charge and amply justifies his disbarment." U.S. Attorney's Brief at 34–35 (our emphasis) (appendix reference omitted).

The deficiency in this argument is that that part of the "precise misconduct originally charged" by the Ethics Committee relating to the $102,000 commission was withdrawn by that committee and not considered by the state court. When Abrams "specifically asked the District Court to decide the matter on the basis of the entire state record", he had the right to assume that the federal court was only going to consider the $20,000 payment. He had the right to assume that in the absence of a Local Rule 7(4) procedure, the only matter relevant in the district court was the charge considered by the state court.

As we have previously observed, the United States Attorney in his brief agrees that "[a]lthough several charges were initially filed against Abrams, only one charge is now relevant." If only one charge is relevant before this court, only one charge should have been relevant before the district court. If the district court chose, as was its right under 7(2)(d), to go beyond the state court proceeding and examine other aspects of Abrams' "conduct unbecoming a member of the bar of this court," it was obliged to follow its own rules. The United States Attorney cannot now, with consistency, argue that Abrams waived [8] his

---

8. The United States Attorney also appears to argue that the burden of initiating the independent investigation under Local Rule 7(4) was on Abrams. "[Abrams] did not ask for further investigations which might have led to the fil-

ing of yet additional charges. He was content to avoid further proceedings then. He cannot be heard to complain now that their lack prejudiced him in any way." U.S. Attorney's Brief at 35. We disagree. The clear meaning of

right to Local Rule 7(4) procedures to defend against charges not processed in the state court, and at the same time agree that only one charge is relevant to these proceedings—that concerning the $20,000 payment.

Accordingly, we hold that the district court erred in considering the "commission aspect" of Abrams' conduct.

Finally, the district court considered its "view" that "[t]he acquisition of an interest in the client's enterprise was obviously a factor that interfered with the exercise of free judgment on behalf of the client." 385 F.Supp. at 1211. For the same reasons that it was impermissible under these circumstances for the district court to consider the "commission aspect", so also was the district court precluded from relying on this perceived impropriety in assessing a greater sanction than the state court. Indeed, if anything, the case against the district court's considering this aspect of Abrams' activities is even stronger, for it was not the subject of any charge contained in the Ethics Committee presentment.

The district court's judgment of disbarment will be reversed.

ROSENN, Circuit Judge (concurring).

I join in the majority opinion. I write to emphasize what I believe should be the proper standard for federal disciplinary action based upon a record compiled in state proceedings.

Each federal court has a broad independent power to discipline members of its bar, initiate and conduct disciplinary proceedings, and impose sanctions predicated upon the record it has compiled. *See Theard v. United States*, 354 U.S. 278, 281, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957). The independence of a district court acting in such fashion circumscribes our authority to review its disciplinary actions. *See Ex parte Burr*, 22

U.S. (9 Wheat.) 529, 530, 6 L.Ed. 152 (1824). When, however, the disciplinary action is dependent on a record developed in state proceedings, I believe the district court should, absent exceptional circumstances, impose the same sanctions prescribed by the state.

This standard is founded upon the vital principle of comity, which represents a "belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). Comity recognizes that the founding fathers created a system "in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.*

In the United States, admission to the bar and discipline of attorneys is peculiarly within the province of the states. *See In re Dreier*, 238 F.2d 68 (3d Cir. 1958). This is the practice in this circuit. New Jersey, for example, has a comprehensive and thoughtful system dealing with every aspect of admission to the bar and any subsequent discipline. Admission to the bar of the District Court of New Jersey is derivative, dependent upon admission to the bar of the Supreme Court of New Jersey. Absent misconduct in the district court, disciplinary actions also are derivative in a sense, since they generally are based, as in the instant matter, on the previously compiled state record; they occur after the completion by the state of its proceedings.

The imposition of disbarment by the federal court when the state has imposed only suspension implicitly attacks the regularity and judgmental values of the state proceedings, implying that the sanction chosen by the state courts is

---

Local Rule 7(4) is that the Chief Judge initiates the reference procedure and that the procedure is mandatory. "[The *Chief Judge*] *shall* refer [the charges of professional misconduct]

for preliminary investigation and recommendation . . . ." *See* page 1102 n.7 *supra* (emphasis added).

inappropriate. This result is bound to create tensions between the state and federal judiciaries.

A second important policy behind the need to avoid disparate sanctions by the federal and state courts is the maintenance of public confidence in our legal system and in the bar. Disbarment is designed to protect the public. *In re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). The district court's action permits Abrams to practice in the state, but not the federal, system. Such an anomaly can only lead to confusion in the minds of the public, which justifiably may speculate why an attorney not qualified to practice in a federal court has sufficient moral character to practice in the state court. Unless an exceptional reason of record justifies such disparate treatment, its effect will, in my opinion, render a grave disservice to the public.

The Supreme Court has recognized the vitality of these interests in *Selling v. Radford*, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). The Court declared that it would afford the utmost respect in sanctioning members of its bar to the judgment of state proceedings unless there was a failure of due process, an infirmity of proof or some other "grave reason" not to give effect to the "natural consequences of the judgment . . . ." *Id.* at 51, 37 S.Ct. at 379. Forty years later, in *Theard v. United States, supra*, the Court, while reaffirming the independence of the federal courts in disciplinary matters, directed a district court imposing sanctions based upon state proceedings to be guided by the standards of *Selling*.

We also have noted the importance of following the judgment of the state courts in these matters. *In re Dreier*, 258 F.2d 68 (3d Cir. 1958). The District Court for the Middle District of Pennsylvania had denied Dreier's application for admission to its bar on the ground that Dreier lacked good moral character due to events for which he had been suspended from the bar of the Luzerne County Court of Common Pleas. Prior to his application for admission to the federal bar, the county bar had restored Dreier to membership in good standing. This court held that the federal district court could not enter an order amounting to permanent disbarment based upon events for which Dreier had paid the penalty imposed by, and had been restored to membership in good standing of, the bar which knew him best.

Finally, the teachings of *Selling* and *Theard* have not been lost upon the district courts throughout the country. Sixty-nine district courts responded to a survey asking whether they ever had deviated from disciplinary actions taken by the courts of their states. One district court, the Southern District of New York, responded that they had a rule permitting disparate discipline for the reasons announced in *Selling* or if "the misconduct established has been held by this Court to warrant substantially different discipline." Rule 5(d). Only three other district courts cited instances of deviating from the action of their state courts. One such instance was *In re Dreier*, just discussed. In another, the disbarment by the district court was reversed for lack of due process. *In re Jones*, 506 F.2d 527 (8th Cir. 1974). In the third instance, the district court had appointed a special master who had conducted a three-day hearing and received much evidence not heard by the Alaskan Supreme Court. *In re Mackay*, 298 F.Supp. 170 (D.Alaska 1969).

In sum, I believe the district court should have followed the standards of *Selling* and *Theard*, which impliedly were recognized by this court in *Dreier*, and which are acknowledged in practice at least by the overwhelming majority of the district courts throughout the country. There is no contention that the state proceedings lacked due process, and the parties stipulated to the relevant facts. The district court did not ade-

quately explicate, and I do not perceive, any grave reasons for choosing more severe punishment than imposed by the Supreme Court of New Jersey.

Since the majority opinion, as I read it, does not preclude the district court from imposing the sanctions decreed by the state court, I join in the reversal.

ADAMS, Circuit Judge (concurring and dissenting).

Since no particularized supplemental allegations were prepared for the district court, the basis for the charge in that court reasonably appeared to be that Arthur L. Abrams had issued a check for $20,000, to be used to bribe a municipal official. It was on this specific charge that the New Jersey Supreme Court had entered its judgment to suspend Abrams from the practice of law for one year.[1] And this charge necessarily must have been the one that Abrams and his counsel had in mind when in the district court they elected to rest on the record that had been before the New Jersey state court.

However, the district court did not confine itself to the bribery charge. Rather, "view[ing] the matter somewhat differently" from the New Jersey Supreme Court, the district court proceeded to consider two additional issues: Abrams' interest in his client's enterprise, and his acceptance of a real estate commission. Concerning these, the district court said:

The acquisition [by Abrams] of an interest in the client's enterprise was obviously a factor that interfered with the exercise of free judgment on behalf of the client.

Another factor is that Abrams accepted a share of a real estate commission paid by the City of Jersey City on the sale of property on public bid. He deposited that share in his trust account, explaining that he considered it to belong to the client, but no credible explanation was provided for the making of the payment in the first place. The commission aspect bears all the indications of a device to divert public funds into channels from which they could be repaid secretly to the public officials. Justification for its payment is not satisfactorily shown.[2]

The state court had taken a substantially diverse attitude toward these two items. As to the propriety of Abrams' association with the business venture of his client, the New Jersey Supreme Court was silent. Respecting the real estate commission, later deposited in the trust fund, the state court, on the same record had acknowledged that:

Though the original creation of the trust fund itself by the respondent was suspect, the record does not permit a finding that it was specifically designed for the illegal payment.[3]

If the district court determined to go beyond the scope of the charges resolved against Abrams in the state proceeding, namely, the illegal $20,000 payment, and to consider other aspects of Abrams' conduct, it should have so advised Abrams and given him and his counsel the opportunity to introduce evidence relating to such conduct. Due process would seem to require as much.[4] No justification has been forthcoming that would excuse

1. *In re Abrams*, 65 N.J. 172, 320 A.2d 471 (1974).

2. *In re Abrams*, 385 F.Supp. 1210, 1211 (D.N.J. 1974) (citation omitted).

3. 320 A.2d at 475.

4. The parties have not disputed that a disbarment proceeding must satisfy procedural due process requirements. Thus, the only issue confronting the Court in this regard is the nature of the procedure that must be employed. *Cf., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). *See* Note, Specifying the Procedures Required by Due Process: Toward Limits on the Use of Interest Balancing, 88 Harv.L.Rev. 1510 (1975).

the failure to supply Abrams a full description of the charges to be considered.[5]

In a case presenting a situation similar to the one here, *In re Ruffalo*, the Supreme Court made it clear that in a disbarment case the charge against the attorney must be set forth at the outset. It said: "[disbarment] proceedings [are] of a quasi-criminal nature. The charge must be known before the proceedings commence." [6]

Nor is it valid to contend that Abrams waived his right to know the charges on which the district court sanction was to be based, or his right to an opportunity to offer a defense against any and all such charges. There is nothing in the district court record which adequately demonstrates that Abrams was aware that charges respecting his relationship with his client and the $102,000 trust fund were under consideration.[7] Where the duty to apprise Abrams of the full reach of a disciplinary inquiry was not discharged, it would not seem reasonable to conclude that Abrams waived his right to present evidence on the two matters that supported, at least in part, the district court's judgment, independent of the state court conclusion.[8]

Accordingly, I agree with the majority that the judgment of the district court cannot stand. There is no way to determine from the record what disciplinary sanction the district court might have imposed had it confined itself—as its rule [9] seems to indicate and due process requires—to the charge adjudicated in the state proceeding and the record that the parties specifically stipulated.

However, unlike the majority, I do not believe that an outright reversal is warranted. Rather, I would vacate the judgment that was entered and remand the case. This would allow the district court a further opportunity to reach its judgment regarding the extent of the discipline, based on the issue derived from the state proceeding, or else to seek to have additional charges filed as rule 7 seems to authorize, plus the opportunity

---

**5.** It is observed that local rule 7(4) for the United States District Court for the District of New Jersey seems to provide for a disciplinary procedure which—at least when it extends beyond the grounds relied upon in a state disciplinary process—calls for notice of the sort that is lacking here. See majority opinion note 7. But apparently the district court which promulgated the rule did not so interpret it, at least in the procedural context that developed here. Rather, the district court's actions suggest that it believed its rules were implemented by the procedures followed in this case.

Because the interpretation of local rules is primarily committed to the district court that promulgates them, and because their meaning in the present context appears somewhat uncertain, I am constrained to reach the question whether constitutional due process has been satisfied.

**6.** *In re Ruffalo*, 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117 (1968) (citation omitted). *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1868).

In three cases subsequent to the *Ruffalo* decision, the Supreme Court has reaffirmed that before proceedings to withdraw a state-controlled benefit are undertaken a respondent must be given both notice of the reasons urged in support of the contemplated action and an opportunity to respond. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (employment termination); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefit termination).

**7.** Some intimation of the breadth of the district court inquiry was discussed at the hearing on June 24, 1974. Transcript 6–10.

**8.** The Supreme Court has indicated forcefully that even in a civil case involving a sophisticated corporate party, the rudiments of due process—notice of charges and a fair opportunity to be heard—are not lightly presumed waived. In *Ohio Bell Tel. Co. v. Public Utility Commission*, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937), the Supreme Court held, "We do not presume acquiescence in the loss of fundamental rights." *Id.* at 307, 57 S.Ct. at 731, *quoted* in *D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 186, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). The standard for finding waiver in the case at hand, a "quasi-criminal" proceeding, should be no less.

**9.** Note 5, *supra*.

afforded Abrams to meet such additional charges.[10]

Chief Judge SEITZ and Judge VAN DUSEN join in this opinion.

VAN DUSEN, Circuit Judge (concurring and dissenting):

While joining in the separate opinion of Judge Adams for reversal and remand due to Local Rules 7(2)(d) and 7(4), I find this an exceedingly close case as to whether affirmance is required on this record, as contended in the United States Attorney's brief, and respectfully state these views not stated in Judge Adams' opinion. I emphasize the majority's language that "the starting point for analysis is the unquestioned principle that the District Court of New Jersey, like all federal courts, has the power both to prescribe requirements for admission to practice before that court and to discipline attorneys who have been admitted to practice before that court" (p. 1099) and that its discipline "may be at variance with that taken by the state court system" (p. 1102).[1] See *In re Fleck*, 419 F.2d 1040 (6th Cir. 1969).

The district court is entitled to regulate its bar, *inter alia*, in order to assure proper advocacy to assist it in the conduct of its judicial functions. In *Selling v. Radford*, 243 U.S. 46, 50, 37 S.Ct. 377, 378, 61 L.Ed. 585 (1917), the Court emphasized "the condition of fair private and professional character, without the possession of which there could be -no possible right to continue to be a member of this Bar."

---

**10.** Whether it is wise or unwise for a federal district court in a situation like the present one to impose disbarment when the highest state court has imposed a temporary suspension is, of course, not before this Court. However, it should be noted that in this regard the Supreme Court has advised the federal courts respecting the considerations that govern a federal disciplinary proceeding that follows a state investigation. *Theard v. United States*, 354 U.S. 278, 282, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); *Selling v. Radford*, 243 U.S. 46, 51, 37 S.Ct. 377, 61 L.Ed. 585 (1917).

**1.** In the case of *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 530, 6 L.Ed. 152 (1824), from which the majority quotes at page 1099 of its opinion, the Court stated:

"If there be a revising tribunal, which possesses controlling authority, that tribunal will always feel the delicacy of interposing its authority, and would do so only in a plain case. Some doubts are felt in this court respecting the extent of its authority as to the conduct of the circuit and district courts towards their officers; but without deciding on this question, the court is not inclined to interpose, unless it were in a case where the conduct of the circuit or district court was irregular, or was flagrantly improper."