**In the Matter of Harry L. SEARS, an Attorney-at-Law.**

**Misc. No. 76–114.**

United States District Court,
D. New Jersey.

Jan. 7, 1977.

### ORDER

It appearing that by Order to Show Cause Harry L. Sears was ordered to show cause why he should not be suspended and enjoined from the practice of law before this court;

And it further appearing that the said Harry L. Sears having waived his appearance on the return date of the order to show cause;

It is on this 7th day of January, 1977 ORDERED that Harry L. Sears be and he hereby is suspended from the practice of law for a period of three years and until further order of the court, effective January 1, 1977;

And it is further ORDERED that the said Harry L. Sears be and he hereby is restrained and enjoined from practicing law during the period of his suspension.

STERN, District Judge, dissents.

LACEY, District Judge, abstains.

BIUNNO, District Judge, did not participate in the decision.

STERN, District Judge, dissenting:

The United States District Court for the District of New Jersey today routinely adopts the three-year suspension from law practice imposed by the Supreme Court of New Jersey upon an attorney admitted to practice before both Courts. I am unable to concur. In my view the record before our Court demands that an independent investigation be undertaken. If the results of such an inquiry were to be consonant with the Presentment returned in this case by the Morris County Ethics Committee, no

lesser penalty than disbarment would be appropriate. In this I join with Justice Sullivan of the New Jersey Supreme Court who, dissenting from the opinion of four of his colleagues,[1] found "respondent's conduct herein so pernicious as to demonstrate his unfitness to continue in the practice of law."[2]

Respondent's conduct was initially investigated by the Morris County Ethics Committee, which conducted formal adversary hearings into the allegations of unethical actions.[3] The Committee thereafter determined that ten violations of ethical standards had been committed by respondent, and transmitted their Presentment of the charges to the Supreme Court of New Jersey.[4] All but two of the charges were sustained by that Court as being supported by clear and convincing evidence.[5] The Court's opinion and those portions of the Presentment which it sustained indicate that respondent Harry L. Sears was a central figure in a protracted scheme having as its object the concealment of one of the most gigantic corporate frauds in the history of our nation. This scheme of concealment initially sought to frustrate an SEC investigation which might have uncovered the massive theft of more than 224 million dollars and other huge irregularities in Robert Vesco's business dealings. In an effort to impede this investigation into Vesco's tangled affairs Sears, who was personally indebted to Vesco, abused his positions of public office and political influence by making repeated efforts to have the Attorney General of the United States intercede with the SEC and its staff on Vesco's behalf. When respondent's repeated political interference with the investigation proved insufficient to thwart the rapidly growing inquiry, he and Vesco (by then his client) conceived of a still more weighty argument against continuing the investigation; an illegal $200,000 cash contribution to the re-election campaign chest of President Nixon. When even this monumental effort failed to halt the SEC staff investigation (and in fact attracted further regulatory attention) respondent commenced a series of false statements to regulatory agencies, grand juries and trial courts in an effort to shield himself and others.

Before canvassing the record presented to our Court in this proceeding, a word is necessary concerning the proper role of the Supreme Court of New Jersey and of our Court when considering the imposition of discipline upon an attorney admitted to practice before both Bars.

From the earliest days of our federal system it has been clear that when a federal court considers disciplining a member of its Bar for conduct which has previously been the subject of state disciplinary proceedings, the federal court must independently evaluate the charges. This is true even though in New Jersey, as in most federal districts, Courts of Appeals, and the Supreme Court of the United States membership in the federal Bar is derivative:

> Though admission to practice before a federal court is derivative from membership in a state bar, disbarment by the State does not result in automatic disbarment by the federal court. Though that state action is entitled to respect, it is not conclusively binding on the federal courts. *Theard v. United States,* 354 U.S. 278, 281–282, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342.

*In Re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). *Ruffalo* and *Theard* dealt with the power of federal courts to impose less severe sanctions. It is, however, entirely clear that this Court has the

---

1. Two of the seven justices took no part in the consideration of the case by the Supreme Court.

2. *In re Sears,* 71 N.J. 175, 364 A.2d 777, at 793, (1976) (Sullivan, J., concurring and dissenting).

3. See generally N.J.R. 1:20–4.

4. N.J.R. 1–20–4(h).

5. *See In re Rockoff,* 66 N.J. 394, 396–397, 331 A.2d 609 (1975); *In re Hyett,* 61 N.J. 518, 520, 296 A.2d 306 (1972).

power to impose greater sanctions on "derivative" members of our Bar than those imposed upon them by the state supreme courts before which they were originally admitted and from which their federal admission "derives."

The Supreme Court of the United States itself has followed this practice over the years. It has frequently disbarred an attorney even though the particular state supreme court from which that attorney's admission was initially derived imposed only a suspension from practice.[6] It should be noted that the Supreme Court has never found it necessary to conduct any separate hearing before imposing these harsher sanctions.

Our Court has also twice seen fit to impose more severe discipline than that imposed by the Supreme Court of New Jersey in the cases of Attorney Abrams and Attorney Caruso. *Matter of Abrams,* 385 F.Supp. 1210 (D.N.J.), *rev'd,* 521 F.2d 1094 (3rd Cir.), *cert. denied,* 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975); *Matter of Caruso,* 414 F.Supp. 43 (D.N.J.1976). While *Abrams* was ultimately reversed, and while both cases evoked dissents, no one has ever suggested that we are required to follow the conscience of the Supreme Court of New Jersey in every case of derivative ad-

mission, regardless of our own judgment.[7] The sister entities in our federal system, the several states, do not thus bind themselves. No state which permits an attorney to be admitted through reciprocity considers that it is later bound by the measure of disciplinary action taken in the state of the attorney's original admission. Clearly no lesser standard of sovereignty should govern our relations with the state courts. Nothing in *Abrams* compels such a result. *Abrams* simply stands for the proposition that if we are inclined, upon our review of the initial record, to impose a different disciplinary sanction than that imposed by the State of New Jersey, we must do more than simply rely on the state record. We must cause our own investigation to be made; permit the respondent to appear; and make findings of our own.[8] The record of the state proceedings in the instant case convinces me that it is essential that we bestir ourselves to make such an inquiry here.

Several members of our Court have expressed the view that differing treatment of the same attorney by different courts " . . . is not only undesirable and contrary to the much to be desired interest of comity, but [it] erodes public confidence in our judicial system." *Matter of Caruso, supra,* at 44 (Cohen, J., dissenting).[9] In a

---

**6.** *See, e. g., In re Disbarment of Osborne,* 420 U.S. 918, 95 S.Ct. 1112, 43 L.Ed.2d 389 (1975); *In re Disbarment of Buttles,* 419 U.S. 1101, 95 S.Ct. 771, 42 L.Ed.2d 798 (1975); *In re Disbarment of Mades,* 414 U.S. 1154, 94 S.Ct. 909, 39 L.Ed.2d 107 (1974).

**7.** This proposition has been universally accepted. See *Matter of Abrams,* 521 F.2d 1094, 1099, 1101 (3rd Cir. 1975). See also *id.,* at 1105 (Rosenn, J., concurring); at 1108 (Adams, J., concurring and dissenting); and at 1109 (Van Dusen, J., concurring and dissenting). See also *Matter of Caruso,* 414 F.Supp. 43, 44 n. 1 (D.N. J.1976) (Cohen, J., dissenting).

**8.** The exact nature of the additional proceedings in this Court which *Abrams* would require is as yet uncertain. In particular, I am not convinced that we are required by *Abrams* to engage in yet another relitigation of factual determinations already made by the Morris County Ethics Committee and affirmed by the Supreme Court of New Jersey.

**9.** The concern expressed for the interests of comity is misplaced. The State has already completed its proceedings before ours even commence. In vindicating the interests of our own Court, we can hardly be said to interfere with a state proceeding that is already concluded. I fail to see how the imposition of a higher standard of conduct, as reflected in more severe federal discipline, could possibly encumber any state institution or chill any state interest. It is precisely this diversity that the doctrine of comity seeks to foster and protect:

. . . the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). Where the state proceedings are over and done with, the application of the doctrine of comity is tautological.

similar vein, Judge Rosenn voiced concern in *Abrams* that when federal courts disbar when a state has merely suspended, the judgment of the federal court " . . . implicitly attacks the regularity and judgmental values of the state proceedings, implying that the sanction chosen by the state courts is inappropriate. This result is bound to create tensions between the state and federal judiciaries." *Matter of Abrams, supra*, 521 F.2d at 1105–1106.

While I recognize the legitimate concerns which underlie these views, I cannot see any help for the fact that our primary duty as judges is to follow our own consciences. Of course occasional differing treatment of an attorney by different courts will create public unease. But public confidence in the judiciary will be more than merely eroded if judges abandon their own concepts of right and wrong in *any* case in favor of creating the mask of judicial unanimity when in fact there is none. Justice Sullivan did not hesitate to dissent from the majority of the Supreme Court of New Jersey when he voted to disbar because he feared that his vote might shake public confidence in the validity of the action taken by the majority. Some of my brothers did not hesitate to dissent in *Abrams* and *Caruso*. Nor did the Court of Appeals for the Third Circuit speak with one voice. The tensions aroused by judicial difference of opinion are an inescapable, indeed a desirable, attribute of a free and independent judiciary. And no citizen would have it otherwise.

But, even if all I have said were wrong, even if public confidence were to be undermined, even if the state court would be offended, I could no more vote to suspend an attorney whom I believed should be disbarred than I could vote to disbar an attorney whom I believed should be suspended, or not disciplined at all, just to put a good judicial face on the entire proceedings. Judges should not just go along.

As the majority of this Court wrote in *Caruso:*

It is the duty of this Court, and every Court, separately to consider and to evaluate each disciplinary matter which comes before it. We do not foresee that this obligation will often cause us to disagree with other courts administering the discipline of other bars. When we do disagree, however, then, with deference and respect to the wisdom and judgment of others, we must follow our own.

*Matter of Caruso, supra,* at 44.

Accordingly, on the record presented to us I dissent from the majority and would instead vote to send this matter to the Ethics Committee of the Association of the Federal Bar of the State of New Jersey for investigation and possible prosecution before our Court. Were such an investigation to establish for us those facts upon which the Supreme Court of New Jersey relied, I would vote to disbar.

In order to make explicit the reasons why I am convinced the case before us requires further action, an abbreviated review of the State record is necessary. According to the Morris County Ethics Committee Presentment, as sustained in relevant part by the Supreme Court of New Jersey, the facts of this lamentable affair may be summarized as follows:

Robert Vesco, a resident of New Jersey, came into control of International Controls Corporation (ICC) and first excited the interest of the Securities and Exchange Commission (SEC) when he caused ICC to take over Bernard Cornfeld's corporation, IOS. IOS had previously been the subject of a federal consent decree, procured by the SEC, which prohibited IOS from marketing its securities in the United States. Vesco thereafter purchased control of IOS on behalf of ICC in a transaction finalized in Switzerland. By early 1971, the SEC had begun an inquiry into the circumstances of that takeover, into the continuing integrity of the consent order, and into other matters concerning ICC. It seems abundantly clear that Vesco was extremely concerned about the scope of the investigation by early 1971. He set about searching for a way to limit or suppress the nascent inquiry.

In early 1971, Respondent Harry L. Sears was a distinguished State Senator serving as the Majority Leader of the New Jersey

Senate. He had already enjoyed an enviable career in public service: State Assemblyman, Speaker of the Assembly, State Senator, Assistant Majority Leader of the New Jersey Senate, and declared candidate for the 1969 Republican nomination for Governor. Despite his unsuccessful race for the nomination, by 1971 Sears' prestige and influence was at an all-time high, due in some measure to his friendship with John N. Mitchell, then Attorney General of the United States. By the end of 1971 or the beginning of 1972 Sears was asked to "head up the efforts in New Jersey toward the re-election of Richard M. Nixon as President." His stature was national:

> According to the testimony of former Governor Cahill, respondent was at that time the most important Republican in New Jersey on the national scene, so much so that *if the Governor wished to obtain something from the federal government in Washington he would and did on a number of occasions have respondent accompany him to Washington, feeling that respondent had more impact than did the Governor.*

*In re Harry L. Sears,* Morris County Ethics Committee Presentment (hereinafter Presentment), at 8–9. (Emphasis added)

Despite Sears' immense influence and power, he had a grave personal problem. Sears incurred debts during his unsuccessful campaign for the Republican Gubernatorial nomination. In early 1971 respondent was indebted to the Morris County Trust Company in the amount of $50,000. Robert Vesco had originally contributed "cash" to Sears' 1969 campaign and had arranged a loan "with the Morris County Trust Company on which Mr. Vesco paid or kept current the interest on the $50,000 loan, the proceeds of which were used to pay off the campaign debts of respondent. The loan arrangements were apparently made on some *informal* basis, since Mr. Vesco had considerable influence at the bank." (Presentment, at 4–5) (Emphasis added).

Throughout 1970 and into March of 1971 (Presentment, 5), Vesco continued to pay the interest on the Sears loan while Sears remained as Majority Leader of the New Jersey Senate. At no time during this period did Sears represent Vesco as an attorney. Sears did not resign from the Senate until the end of December 1971, and did not become counsel to Vesco until 1972. (Presentment, at 3, 7, 8) Considering the financial relationship between the two men, it was perhaps natural that Vesco turned to Sears virtually at the outset of the SEC investigation, which the Supreme Court found was begun on March 18, 1971. Vesco appealed to Sears for help to "limit S.E.C. discovery". *In re Sears,* 71 N.J. 175, 364 A.2d 777, 779 (1976). First, Vesco asked respondent (who was then Majority Leader of the State Senate) to contact a member of the United States District Court, Judge Wortendyke, and to tell Judge Wortendyke that "Bob Vesco is not a bad guy because he is suing the United States." *In re Sears, supra,* 71 N.J. 175, 364 A.2d at 785. Judge Wortendyke was then presiding over a lawsuit which Vesco had brought against the SEC " . . . to restrict the scope . . . " (*In re Sears, supra,* 364 A.2d at 785), of the SEC investigation. By means of a letter dated May 5, 1971, addressed to an ICC vice president, Sears reported that he had spoken to the judge about the case. See *In re Sears, supra,* 364 A.2d at 785.

It should be noted that Sears testified before the Ethics Committee that he in fact did not make contact with the judge and that he lied to Vesco, although he conceded the impropriety of his letter before the Supreme Court of New Jersey. In any event, the suit was not successful in limiting the SEC probe.

At the request of Vesco, Sears, while still Majority Leader, repeatedly contacted his friend, the Attorney General of the United States, throughout 1971: " . . . *the discussions which occurred did not concern the substantive merits of the S.E.C. investigation, but rather its scope and methods and the possibility of restricting them.*" *In re Sears, supra,* 364 A.2d at 783. (Emphasis added)

Thus in July 1971, Mr. Vesco asked respondent to contact Mr. Mitchell concerning the S.E.C. investigation and requested that respondent attempt to have Mr. Mitchell contact the Chairman of the Commission, William Casey, in order to induce the Chairman to become involved in the investigation. Respondent did make the attempt through Mr. Mitchell, and Mr. Mitchell apparently endeavored to carry out respondent's wishes.

Presentment, at 31.

Further,

Mr. Vesco conveyed to respondent his desire to become a substantial contributor to the campaign to re-elect President Nixon. Respondent attended a meeting at the White House with John Erlichman, one of President Richard M. Nixon's closest staff aides. The purpose for the meeting with Mr. Erlichman included assuring the White House through Mr. Erlichman that Mr. Vesco was not a "bad guy". In or about the same time that the meeting with Mr. Erlichman took place, respondent was advised by Mr. Vesco that he (respondent) could be helpful on the S.E.C. investigation and that Mr. Vesco wanted to get information before the Commission. He asked respondent whether the ear of the Chairman of the Commission could be reached through Mr. Mitchell. On January 12, 1972 respondent met with Mr. Mitchell and brought Mr. Mitchell up to date on the status of the S.E.C. investigation and requested that Mr. Mitchell speak to Mr. Casey to get the latter interested in the case. At about the same time, respondent was present at a meeting of the Board of Directors of I.C.C. At that meeting Mr. Vesco announced to the Board of Directors that respondent was going to be working on the S.E.C. investigation through the Attorney General. Respondent testified that he told Mr. Vesco that such an announcement was inappropriate. However, it was well understood that respondent was to play an important role in the S.E.C. investigation and that in fact his ability to play such a role was due largely to his friendship with Mr. Mitch-

ell. Thus, it was insignificant that respondent had no knowledge or experience whatsoever in securities law or in the practice before the S.E.C.

Presentment, at 32–33.

Thus, the Supreme Court of New Jersey found, by clear and convincing evidence, that respondent made persistent efforts to obstruct the legitimate activities of a federal regulatory agency by means of influence peddling and the misuse of his own public office and political position. Throughout most, if not all, of this period Sears was Majority Leader of the New Jersey State Senate and did not represent Vesco as an attorney. Nonetheless, for at least as early as the beginning of May to the end of December of 1971 Sears repeatedly used his position to solicit improprieties from the Attorney General of the United States; from John Erlichman, one of the chief advisors of the President of the United States; and, indirectly, from the Chairman of the SEC. He also created the impression that he could similarly "reach" a judge of this very Court. I pause to note that if this were to be proven before our Court, as it has been before the State court, then on this alone I would vote to disbar. But the Morris County Ethics Committee and the New Jersey Supreme Court went further in their factual exploration of respondent's conduct.

Upon leaving the State Senate in January of 1972, Sears became

associate counsel for the I.C.C. organization. The fee arrangement provided that respondent would receive $35,000 *in advance.* He would also receive a monthly retainer of $5,000, of which $1,500 would be used to pay off the $35,000 advance over a period of time. *By agreement with his firm the monies paid to him under his arrangements with Mr. Vesco were retained by him and did not become part of the firm's accounts . . .*

*It is not clear what duties were to be undertaken by respondent in serving as counsel for I.C.C.*

Presentment, at 7–8. (Emphasis added) It is sufficient to note for the present that the

circumstances surrounding the fee arrangement do nothing to rebut the inference that in fact these monies represented payment for past illegal acts. This is certainly an area which could be further explored if this Court were to cause its own investigation to be made.

By January 18, 1972, despite respondent's efforts to chill the investigation, Vesco remained in jeopardy.

Vesco hoped that Mitchell, as a leading figure in the Administration, could induce S.E.C. Chairman William Casey personally to monitor and limit the investigation. Vesco's requests were conveyed by Sears in two letters and during three meetings with Mitchell. Respondent's efforts, however, proved largely fruitless. A meeting between representatives of I.C.C. and S.E.C. on January 19, 1972, reflected the continued tension between the two sides, and was, as Vesco described it, a "disaster."

*In re Sears, supra,* 364 A.2d at 779.

At this time a new course of action was devised. It was agreed between respondent, by now not only Vesco's attorney but Nixon's New Jersey Campaign Director, that Vesco would make a huge contribution to Richard M. Nixon's campaign.

Vesco told Sears that he was prepared to offer up to $500,000 to the campaign to re-elect President Nixon.[10] At about that time Maurice Stans, the former Secretary of Commerce, was in charge of fund raising for this re-election effort. With this in mind, Sears arranged yet another meeting with the Attorney General of the United States on behalf of Vesco. The meeting occurred on February 11, 1972:

On February 11, 1972, respondent met with the Attorney General *and again sought to prevail upon the Attorney General to speak with the Chairman of the Commission and on this occasion sought to obtain a meeting between himself and the Chairman of the Commission.* Respondent testified at the Ethics Hearing that he also discussed Mr. Vesco's interest in making a large campaign contribution. Respondent discussed with Mr. Mitchell respondent's reservations about the making of a large campaign contribution because of the pending investigation by the S.E.C. Mr. Mitchell indicated that he would discuss the propriety of the contribution with Mr. Stans. At the conference of February 11, 1972, *Mr. Mitchell showed respondent a memorandum (Exhibit R–16) that had been prepared by Mr. Cook, SEC General Counsel, for Chairman Casey.* The memorandum outlined the status of the investigation of I.C.C., Mr. Vesco and a Mutual Fund known as I.O.S. Ltd. The memorandum outlined the S.E.C. position that certain transactions by I.C.C. and Mr. Vesco with respect to shares of I.O.S. Ltd. were in violation of the U.S. Securities Laws. *Moreover, the memorandum concluded that Mr. Vesco had perjured himself in testimony that he had given in the course of the S.E.C. investigation.*

Presentment, at 33. (Emphasis added)[11]

Despite these developments, the plan to make the cash contribution proceeded apace. Sears decided that only $50,000 would be publicly disclosed by having Vesco contribute to the New Jersey Nixon Campaign Committee (which Sears headed).

---

10. According to Sears' testimony as reflected in the Presentment, Sears discouraged Vesco from the $500,000 contribution as too large because of the SEC investigation. He suggested that $250,000 would be more appropriate. (Presentment, at 10)

11. Thus, according to the presentment and the Supreme Court opinion, (1) Sears again asked Mitchell to intercede, (2) Mitchell showed Sears an internal "confidential" (Presentment, at 16) document of the SEC, (3) that internal docu-

ment gave cause to believe that Vesco had violated a federal court order and had committed perjury before a federal agency, and (4) the fact that Mitchell had obtained such an "in House" SEC document demonstrated that the prior contacts between Sears and Mitchell had not been entirely fruitless. It has never been explained how Mitchell got a memorandum prepared by the counsel for the SEC for the Chairman of the SEC, or by what right Sears gained access to it.

Two hundred thousand dollars, however, would be secretly contributed in cash:

> *Apparently it was respondent's suggestion that resulted in the decision to make only part of the contribution public with the major part of the contribution remaining a secret contribution.* Respondent testified before the Committee that the reason for the suggestion was related to his reservations about making a contribution during the pendency of the investigation. It was his belief that the public portion of the contribution should be $50,-000 because that sum generally was consistent with Mr. Vesco's past contribution pattern. The more substantial sum of $200,000 would be a secret contribution in order to discourage any inference that the contribution was made to influence the investigation.

> Respondent met with Mr. Stans on April 3 to work out the mechanics of the delivery of the contribution   .   .   ..

The fact that the contribution was to be in cash was a fact that respondent testified made him "clearly uneasy" and "not my way". During the course of the Committee hearing, there was much discussion related to the need for cash in an election campaign. However, no satisfactory explanation was offered as to the need for the contribution itself to be in cash. Thus, it was readily conceded by respondent and others that a contribution could be made in the normal course and then turned into cash if there were cash needs for the campaign. Further, re-

spondent was made uneasy when on April 3 Mr. Stans referred to the contribution as "*the material*". Respondent imparted to the Committee the concern that enveloped the trip to Washington to deliver so large a sum of money.

The foregoing events must be taken into account in considering the state of mind of the respondent with respect to the events of April 10, 1972. One in respondent's position could scarcely escape a sense of realization of two developing and converging courses of events. One related to the respondent's involvement in a secret cash contribution of a substantial sum of money for the re-election of the man who was the President of the United States. The other was respondent's own personal involvement in Mr. Vesco's problems with the S.E.C. and Mr. Vesco's asking respondent to use his influence through the Attorney General of the United States to affect favorably the course of the S.E.C. investigation. Presentment, at 34–35. (Emphasis added)

The cash was delivered to Sears on April 10, 1972. The facts as found by the New Jersey Supreme Court suggest potential violations of various federal statutes, most obviously those prohibiting bribery and obstruction of justice. Next was the then-current federal prohibition against corporate contributions to federal elections and the corresponding requirement that all contributions received after April 7, 1972 be publicly reported. While there may be debate as to whether Sears violated the first group of statutes,[12] there can be no doubt

---

12. At this point the Presentment reaches two contradictory conclusions. Compare,

> While the Committee is of the opinion that there is insufficient evidence to find clearly and convincingly that prior to April 10, 1972 respondent knowingly participated in the delivery of a campaign contribution to affect the outcome of the S.E.C. investigation, those events should have raised questions in respondent's mind concerning Mr. Vesco's purpose in making the contribution; and necessarily influence the perspective through which the events of April 10, 1972 are examined.

(Presentment, at 34–36)
with:

> The Committee finds that *there was sufficient evidence prior to April 10, 1972* to alert respondent to the potential misuse inherent in a large secret cash contribution made to re-elect the President of the United States by a person under investigation (with criminal overtones) by an agency of the Government. The Committee further finds that the inherent potential became a reality, and that on April 10, 1972 respondent knew that the contribution was made by Mr. Vesco in order to affect the outcome of the investigation. Notwithstanding such knowledge, respondent continued his efforts to utilize his friendship with Mr. Mitchell and directly participated in the effort to affect a favorable disposition of

that he did violate the campaign spending law. His defense, which the county Ethics Committee found to be credible, is that he did not know the $250,000 were corporate funds (Presentment, at 11–12), and that he relied on Stans' advice that it did not have to be reported.

The fact, however, as found by the Supreme Court, is that the funds were corporate, obtained by Vesco through a Bahamian bank. Even if it cannot be proven that Sears *then* knew of that bank, it is clear that Sears took the money in a *corporate* plane. He was accompanied by Richardson, the President of ICC. It was Richardson who, in Sears' presence on April 10, handed the money ("the material" in the argot of the schemers) to Stans. On the record presented to us, it is difficult to credit Sears' explanation that he thought these were private funds. As far as the reporting date is concerned, it was Sears himself, the Ethics Committee found, who told Vesco to split the money into two contributions and to be sure that the $200,000 was delivered prior to April 7.

The events in Stans' office on April 10, 1972 are best illuminated by the Presentment, at page 36:

> On April 10, 1972 Mr. Richardson and respondent arrived at Mr. Stan's [sic] office. Respondent testified that a briefcase containing the cash contribution was placed upon Mr. Stans' desk by Mr. Richardson. Pleasantries were exchanged. Then, according to the testimony of respondent, Mr. Richardson expressed the hope that help could be received on the S.E.C. investigation. Respondent testified that Mr. Stans replied that the S.E.C. investigation was not his "bailiwick" but that Mr. Mitchell and perhaps respondent were working on that aspect of the matter. Respondent testified that at that point he rose and stated that there was no "quid pro quo" for the contribution. Respondent's version of his remarks was compromised to some extent

the S.E.C. investigation. Respondent's continuation of his efforts in the face of such

by the testimony of John R. Wing, the Assistant U. S. Attorney who tried the case against Mr. Mitchell and Mr. Stans in the Southern District of New York. (Hereinafter, "The Mitchell-Stans trial"). Mr. Wing testified that at the trial in New York, Mr. Richardson testified that respondent rose from his seat after Mr. Richardson and Mr. Stans had spoken and changed the subject of the conversation to the weather and then quickly ushered Mr. Richardson from the room. . . .

It should be noted that although Richardson is a resident of Livingston, New Jersey, he was not called by the Committee.

In spite of the fact that Sears had spent nearly a year, and had used every strategy, some apparently illegal and many clearly unethical, in his attempt to squelch the SEC probe of Vesco; in spite of Sears' central role in managing the $250,000 contribution in April 1972; the county Ethics Committee charitably chose to credit his explanation that prior to the date of the contribution he made no mental connection between the cash contribution and his client's efforts to limit the SEC investigation. Not even the most charitable viewing of Sears' conduct on April 10 after leaving Stans' office can avoid the obvious—Sears was attempting to convey a massive bribe from Vesco to the Administration, to buy off the SEC.

Respondent testified before this Committee that after he left Mr. Stans' office he had a further conversation with Mr. Richardson, either in the hallway outside of Mr. Stans' office or after leaving the building. The thrust of the conversation was Mr. Richardson's advice to respondent that Mr. Vesco had wanted Mr. Richardson to convey a stronger message to Mr. Stans.

It is important to consider at this point respondent's state of mind at the time that he left Mr. Stans' office. It would have been apparent to anyone attending the meeting that Mr. Richardson had conveyed to Mr. Stans that help on the

knowledge constitutes unethical conduct. (Presentment, at 47) (Emphasis added).

S.E.C. matter was indeed expected as a result of the contribution. In fact, that is the very conclusion that respondent urges upon the Committee when he testified that he rose from his seat and exclaimed that there was no "quid pro quo" for the contribution. The response by Mr. Stans to Mr. Richardson's statement would also lead one to believe that there was to be help on the S.E.C. matter but that the help was to come from Mr. Mitchell (or respondent) and not from Mr. Stans. At the conclusion of the meeting, the purpose for the contribution is made absolutely clear by Mr. Richardson when he advised respondent that Mr. Vesco had desired a stronger message.   .   .   . The Committee concludes that at the conclusion of the meeting in Mr. Stans' office on April 10, 1972 respondent knew that Mr. Vesco's intention in making the contribution was at least in part to influence the outcome of the S.E.C. investigation.

*After the conclusion of the meeting with Mr. Stans, respondent met with Mr. Mitchell at the latter's office. Respondent advised Mr. Mitchell that he had just delivered the contribution and asked Mr. Mitchell whether the latter had arranged for the meeting with Chairman Casey. Respondent testified that Mr. Mitchell picked up the telephone and called Chairman Casey and that a meeting was scheduled with Chairman Casey for that day.*

In discussing respondent's role after the delivery of the contribution, it is important to examine the evidence concerning respondent's aim in meeting with the Chairman of the S.E.C. In respondent's direct testimony before this Committee, he asserted that his role was first to gain an audience with Chairman Casey to present grievances that Mr. Vesco felt he had concerning various harassing actions taken by the staff of the S.E.C. These actions related to repetitive subpoenas for voluminous documents, rejection of legitimate requests for adjournments, and other like tactics. The second aspect

of his role was to resolve an outstanding issue of document production by the Vesco group. A third role was to get Mr. Vesco's version of events to the Commission level before precipitous action was taken by the Commission. In this regard, respondent wishes to obtain for Mr. Vesco the opportunity to see any report submitted by the Staff to the Commission and to respond to the report before action was taken by the Commission. In his direct testimony, respondent testified that these were the areas that were discussed at the meeting of April 10, 1972.

On the other hand, at the Mitchell-Stans trial in New York, respondent testified that Mr. Cook advised him that it was very possible that the case could not be settled without an injunctive order, that a report recommending suit was likely and that there could be a perjury charge. (T. 3438). Respondent also testified at that trial that he himself suggested the possibility of settlement. (T. 3444). Respondent also testified that the question of settlement was discussed at a meeting in May, 1972 attended by Mr. Vesco, Mr. Cook and respondent. (T. 3473).

The Committee had the benefit of the testimony of Robert Kushner, S.E.C. Staff Attorney, who was assisting the investigation. Mr. Kushner testified that after the meetings between respondent, Chairman Casey and Mr. Cook, it was conveyed to Mr. Kushner by Mr. Cook that the substance of the meetings had been the question of settlement. In June of 1972, Mr. Cook asked the staff what a settlement would look like. Mr. Cook suggested to Mr. Kushner the idea of the simultaneous filing of a Complaint and Consent Decree with no criminal charges. Later, another staff member attended a meeting with Mr. Cook, Mr. Vesco and respondent. This person made a memorandum of the meeting and the memorandum included what a possible settlement might entail.

Mr. Kushner's testimony, and that of others, also raises questions as to whether

respondent's reasons for seeking the meeting with Chairman Casey were as stated by him. . . .

Presentment, at 37–41. (Emphasis added)

While reserving consideration of those portions of the New Jersey Supreme Court's opinion dealing with Sears' false testimony before various bodies, it is now appropriate to note that, against the background of Sears' prior efforts to limit the SEC inquiry, even the credibility of a child would be strained by any innocent explanation of the events of April 10, 1972. The Ethics Committee and the Supreme Court depict Sears carrying an illegal contribution, illegally concealed, in cash; being present when Stans is told that Vesco wants help; going himself *immediately* to Mitchell; and arranging for an immediate conference with SEC Chairman Casey to "settle" the investigation—all on the same day! Again, if what appears as undisputed fact in the State proceedings were established here, I would disagree with the majority and would request the Ethics Committee of the Association of the Federal Bar to investigate with a view to the possible disbarment of respondent.

We now go on, however, to the third phase of the saga, the post-"contribution" chapter.

In late June or early July of 1972, Mr. Vesco advised respondent that he felt that the various meetings were not being productive. He requested that respondent talk to Mr. Stans about the situation. Respondent indicated that he felt that that would not be an advisable thing to do and indeed stated that it was the worst thing that could be done. It is perhaps significant to note that respondent did not indicate to Mr. Vesco that he thought such an approach would be improper. On July 10, 1972 respondent met with Mr. Mitchell once more to bring Mr. Mitchell up to date on the status of the discussions relating to the S.E.C. investigation. There was a further meeting with Chairman Casey on July 10, 1972. The stated reason for this meeting was

again to persuade Chairman Casey to permit the Vesco version to be presented to the Commission before Commission action. The stated reasons are not sufficient to explain the need for the meeting with Chairman Casey, in light of respondent's testimony that he had on previous occasions conveyed to Chairman Casey the desire to have the Vesco version before the Commission and that Chairman Casey had agreed that the request was a reasonable request. There was an additional meeting with Mr. Mitchell on July 20, 1972, again related to the S.E.C. investigation and the status of it. In August of 1972 Mr. Vesco advised respondent that he would attempt to obtain the assistance of Leonard Hall, a former law partner of Chairman Casey. Respondent demurred, again not on the ground that it would be improper but on the ground that it would be embarrassing for him because Mr. Mitchell would be likely to hear that someone else was being approached to assist in the S.E.C. investigation.

In August of 1972 an event occurred which substantially altered the course of the S.E.C. investigation. Subpoenas were issued to the American National Bank & Trust for documents relating to securities sold by the American National Bank & Trust for companies that were controlled by Mr. Vesco. This was the first concrete evidence of the looting by Mr. Vesco of various off-shore mutual funds. Thereafter, the S.E.C. investigation inevitably uncovered the transfer of $200,000 in cash from a Vesco-controlled bank to a former officer of I.C.C. *The efforts made by respondent and others to deflect the investigation from inquiry into the destination for the $200,000 contribution* are described in the Summary and in the discussion of the FOURTH COUNT and FIFTH COUNT, below, at pp. 52–56. These efforts included attempts on the part of respondent to have subpoenas withdrawn and adjourned and attempts on his part to have the investigation lim-

ited to the source of the contribution rather than its destination.

Presentment, at 42–44. (Emphasis added)

Sears had attempted to limit the SEC throughout 1971 and early 1972 through his "contracts" with Mitchell. In April of 1972, a "substantial contribution" had been made. Now the participants faced even greater problems: the SEC had blundered on the information and some of the documentation relating to the illegal $200,000 payment, and Sears began to devote his efforts to suppressing this aspect of the probe.

Respondent continued to be active in New Jersey throughout the 1972 campaign on behalf of the Nixon re-election effort. A publicly reported contribution of $50,000 was made by Mr. Vesco some time around October of 1972. By October of 1972 the S.E.C. had traced $200,000 from the bank in the Bahamas through a former officer of the Vesco organization to Barclay's Bank in New York. In October, subpoenas were issued to four persons, Mr. Richardson, Mr. Clay, and two secretaries of I.C.C. *At the request of Mr. Vesco, respondent approached Mr. Mitchell and asked that these subpoenas be delayed or "withdrawn".* His stated reason was that he was fearful that the publicity attending the testimony resulting from the subpoenas would be detrimental to the campaign of Richard Nixon. He denies that he ever intended that the subpoenas be withdrawn completely, but claims that he only wished to have them postponed until after the election and to limit their scope. He further testified that Mr. Vesco stated that he wanted the subpoenas withdrawn, and if they were not, the fact of the contribution would become public knowledge.

Presentment, at 17.[13]

---

**13.** These findings resulted in the drafting of the Fourth Count of the Presentment, which is reprinted here:

The Fourth Count of the Statement of Charges relates to the involvement of respondent in an attempt to adjourn or withdraw, as the case may be, subpoenas served by the S.E.C. in the course of the Vesco investigation in October of 1972. This Count also includes allegations directed to an alleged attempt to limit improperly the scope of the S.E.C. inquiry. The Statement of Charges alleges that respondent's conduct violated DR1–102A(3)(4)(5) and (6), DR9–101(c) and DR7–110(B).

It is admitted that respondent sought the aid of Mr. Mitchell, who had formerly been the U.S. Attorney General, and who was then in the private practice of law, and was a friend and associate of President Nixon.

The Committee finds that while respondent and Mr. Mitchell did, in fact, discuss the possibility of attempting to limit the scope of the S.E.C. inquiry to the origin of the Vesco funds, there is no clear and convincing proof that respondent requested Mr. Mitchell to use his influence to so limit the scope of the inquiry. Furthermore, the Committee finds that there are no proofs that Mr. Mitchell did so request that the S.E.C. limit its inquiry. Therefore, the Committee will limit itself, in this Count, to this request by respondent to have the Vesco subpoenas adjourned or withdrawn.

The proofs showed that when Mr. Vesco was served with the subpoena, Mr. Vesco told respondent that if these subpoenas were not stopped, Mr. Vesco was going "to blow the lid on the whole thing", referring to the $250,000 campaign contribution and that respondent should call Mr. Mitchell. Respondent told Mr. Mitchell what Mr. Vesco had said.

Respondent contends that the request to Mr. Mitchell as to these subpoenas was motivated and justified by their mutual concern as to the effect of the public disclosure of the $250,000 Vesco cash contribution on the upcoming presidential election less than a month away. While the Committee agrees that this certainly was a factor in the request to have the subpoenas withdrawn, the Mr. Vesco threat or statement about blowing the lid, the concern of respondent as to the "optics" and the growing concern by respondent that his conduct may have been regarded as a violation of the Federal Campaign Contribution Law also were determinative factors in the decision to ask Mr. Mitchell to have the subpoenas withdrawn.

Thus, while there is a conflict in the testimony of respondent before the Grand Jury and at this hearing as to whether respondent requested Mr. Mitchell to have the subpoenas adjourned (respondent's contention) or withdrawn, the Committee finds on a review of all of the testimony that respondent did, in fact, request that the subpoena be withdrawn.

Based upon the foregoing the Committee finds that the conduct of respondent did vio-

There is yet one more chapter in this sordid story. It concerns the actions of respondent when the scheme unravelled. The Ethics Committee found, and the Supreme Court generally affirmed, that Sears made repeated and "deliberately misleading and false answers" under oath, first before the SEC, then before a federal grand jury and finally during the federal criminal prosecution of Mitchell and Stans. See Presentment, at 20, 37–38, 44, 45, 46, 63–64, 76:

. . . on February 28, 1973, the news of the role of respondent in delivery of the contribution became public when the transcripts of the depositions were filed with the Court in the S.E.C. civil suit. There followed immediate and widespread publicity and during the course of a few days or weeks thereafter, the position and reputation of respondent were several [sic] damaged.

Commencing on March 6th, 1973 respondent was summoned as a witness before the Grand Jury in the Southern District of New York and testified there on nine occasions. . . . *[T]he testimony bears out the description given by respondent at trial, that the testimony was deliberately misleading and false at the time of the Grand Jury hearings, and that the reason for the testimony being misleading and false was out of the desire of respondent not to involve Mr. Mitchell* (unfairly as respondent saw it) in a situation in which he really believed that Mitchell had no part, and in the view of

the Committee, *also to avoid making "the optics" of a bad situation look even worse for himself and the others involved.*

Presentment, at 19–21. (Emphasis added)

Before the United States Grand Jury, Sears misinformed the Grand Jury about the events of April 10, 1972. His explanation is that he simply forgot about his successive meetings with Mitchell and Casey. The Ethics Committee made the following finding:

### TWENTIETH AND TWENTY–FIRST COUNTS

The Twentieth and Twenty-First Counts deal simply with the question of whether the respondent is to be believed when he stated that he failed to recall that on April 10, 1972 he went to Washington, D.C.; in going to Washington, D.C. he accompanied a contribution of $200,000 in cash; he went there at a time when he knew that the contribution was not to be reported, despite the fact that the reporting date had passed; that he met with Mr. Stans; that shortly thereafter he met with the former Attorney General of the United States; that shortly after that, he met with the Chairman of the S.E.C.; that the sequential meetings necessitated an embarrassing non-appearance to a good client in New Jersey.

Respondent at the hearing has characterized his own failings to recall these events as incredible. *Without reaching*

---

late DR1–102A(3)(4)(5) and (6), DR9–101(c) and DR7–110(B).

None of the factors referred to previously could justify respondent requesting the assistance of Mr. Mitchell on the facts as the Committee finds them. Mr. Mitchell was not in any way connected with the case as an attorney. His assistance was sought by respondent, as directed by Mr. Vesco, because of his powerful position and the hope of Mr. Vesco and respondent that, as a result of Mr. Mitchell's connections and influence he could have the subpoenas withdrawn, so that Mr. Vesco would not have to testify.

The Committee rejects the contention that the S.E.C. proceedings were not "adversary" and that there were no communications "as to the merits of the cause", as set forth in DR7–110(B).

The Committee also notes, and this is not disputed, that only a short time prior to the incident included in the Fourth Count, other S.E.C. subpoenas had been served upon the American National Bank and Trust, demanding the production of documents. In this instance, when there was a contention that the subpoenas were too broad, respondent did not contact Mr. Mitchell requesting his assistance, but contacted Mr. Kushner, a S.E.C. staff attorney, and attempted to persuade Mr. Kushner to limit the scope of this subpoena.

The Supreme Court sustained the Presentment on this Count. *In re Sears, supra,* 364 A.2d at 788.

*the more difficult question as to whether respondent misrepresented the situation at the Ethics hearings, we find that sufficient clear and convincing evidence exists to demonstrate that his failure to disclose that those events occurred at the same time (regardless of the actual dates), was deliberate, and not the result of faulty memory.*

Additional proof regarding this evasiveness is found from the incident at the U.S. Attorneys' Office in which respondent, while being prepared for trial, was requested to review his Grand Jury testimony and to place a single clip in those areas where an inaccurate statement appeared but that inaccuracy was the result of only a faulty recollection. Upon completion of that task he was then asked to re-review the same testimony and to place double clips in those areas where the inaccurate testimony was not the result of faulty recollection but was simply a false statement and was false at the time it was made. Respondent did double clipping in a number of areas directly tied to his failure to reveal Mr. Mitchell's involvement on the date of the contribution was granted. [sic]

Consequently, it is our finding that on both of these Counts respondent did in fact falsely and evasively make the statement as alleged and it is the Committee's finding that he is guilty of violations of DR–102 on both counts.

Presentment at 88–89. (Emphasis added) The Supreme Court of New Jersey affirmed. *In re Sears, supra,* 364 A.2d at 786.

The question now before this Court is whether to adopt the sanction imposed in the Supreme Court of New Jersey as our own, or whether to convene our own disciplinary proceeding under the aegis of *Abrams.* The record before us suggests that respondent impugned the honor of an honest federal judge, subverted a major federal investigation, engineered a massive illegal payment, and consistently lied under oath to every investigative body which has tried to drag the truth into light. The Supreme Court of New Jersey determined

that these acts were proven and warranted a three-year suspension. I think, if proven here, they demand disbarment; and I therefore would vote to convene our own disciplinary proceedings.

In determining to suspend respondent the State Court said:

We are initially cognizant of the danger that respondent's actions may be inextricably colored by the unfortunate chapter in our Nation's history in which they occurred. The effects of the Watergate crisis have not only awakened a political awareness within the country, but have introduced a *new* perspective from which to view and evaluate the conduct of public figures. The "post-Watergate *morality*" emphasizes a *new* standard by which to measure the propriety of their actions and the accountability of such personages for their conduct. We recognize the salutary effects of this *new* perspective and welcome it. Nevertheless, our obligation to impose discipline for respondent's ethical violations requires a fair assessment of his conduct apart from the unlawful acts of many national officials. We must guard against using this case as a *symbolic* protest against the immorality associated with the Watergate affair. *Cf. In re Spritzer,* 63 N.J. 532, 309 A.2d 745 (1973); *In re Queenan,* 61 N.J. 579, 297 A.2d (1972).

*In re Sears, supra,* 364 A.2d at 789. (Emphasis added)

With all deference to the Supreme Court of New Jersey, I am simply at a loss to perceive what "*new* perspective" or "*new* standard" Sears violated, or how his disbarment could be viewed as "symbolic" protest rather than simple justice. What the Supreme Court found Sears did has always been intolerable in a citizen, an official, or an attorney. He knew many of his actions were illegal. And, the Court found, he consistently lied about the acts under oath, in order to conceal what he knew to have been wrong. No "*new*" standard suddenly made these acts illegal. One can but won-

der under what "*old*" standard Sears lived or practiced law.

The State Court, however, also noted that discipline is *nonpunitive* in its essence and that it was unlikely that Sears would "engage in similar activities in the future"; ". . . we are confident that such an episode will never re-occur." The suggestion implicit here is that disbarment should not be invoked to punish Sears and is not necessary to protect the public against future similar transgressions by him. In this connection the Court noted the great impact that these disclosures have had on Sears:

> The respondent's resulting state of mental depression is well-documented in the record. Ample testimony exists concerning the manner in which respondent has been changed from a gregarious, vibrant individual to an unresponsive and melancholy one. Furthermore, evidence at the ethics committee hearing indicated that this psychological state severely compromised respondent's ability to function normally. This condition might not only explain some of the lapses of memory which characterized respondent's testimony, but also his apparent inability to prepare for his appearances before various investigatory tribunals.

*In re Sears, supra,* 364 A.2d at 790.[14]

Again I am unable to agree. Of course it is unlikely that Sears will ever again be an intimate of the Attorney General of the United States, or have private access to the Chairman of the SEC, or that he will again be in a position to say he has influenced a member of this Court. But this is because he has been caught and unmasked. One could say as much for any attorney, public officer, fiduciary, or trustee whose frauds and misconduct have been bared. It was not likely that the mayors of Newark, Jersey City and Atlantic City would again so misuse their public positions after they were convicted, but that was no reason to keep them in public trust or out of jail for that matter.

We must not be blind to the fact that the discipline of attorneys *is* punishment, no matter what we choose to call it, and we

14. The public response to such argument is well stated in a recent letter to the New Jersey Law Journal:

Editor, New Jersey Law Journal:

A review of the Ethics Opinions published in recent months has convinced some of us that very little has changed, except that more attorneys are being "caught in the act." The punishments meted out, however, still create bewilderment. It all makes one wonder whether there may exist some underground unofficial "Guide to the Punishment of Unethical and/or Illegal Acts Committed by Members of the Bar," which follows:

I. Embezzlement or similar exaggerated misuse of someone else's money. This is a real disaster, generally punishable by disbarment. These acts should be scrupulously avoided by those who have not been trained and licensed by the Mafia, that excellent school established to teach the commission of murder, mayhem, and misappropriation without getting caught.

II. Perjury, subornation, bribery, tampering with a jury, violations of the tax laws and similar acts. Generally punishable by suspension for one to three years.

To minimize the length of suspension, it is useful to plead as a defense a neurotic spouse who drove the malefactor into debt or out of his mind. If such a defense is unavailable due to the proliferating divorce rate, one should try slumping around looking very depressed. Such an attitude is not too difficult to emulate, especially when one knows that everyone else knows what one has really been doing, and that one was stupid enough to get caught doing it.

However, if slumping around for a long period of time taxes the spinal cord too much, it is always useful to rest upon one's past career of public service and unblemished record (which often means that one just hasn't been caught before).

N.B.: Suspension provides good free publicity, which is otherwise barred by the Code of Ethics. Guaranteed to build up one's clientele, which will patiently delay litigation until its hero is reinstated.

III. Physically assaulting one's adversary in the Courthouse. Generally punishable by a reprimand. However, it is advisable not to involve a judge, robed or not, and his law secretary in the fracas. That is a sign of bad manners.

If the foregoing "Guide" exists, it is not to be relied on for too long a time, for it is well known that an act that is considered unethical and punishable today may be deemed otherwise tomorrow.

Audrey Scharff

must be certain that the discipline which is imposed is commensurate with the wrong which has been done. Courts are no strangers to contrition and repentance after conviction, nor are they immune from the sympathetic stirring at the sight of one who has fallen so far. And while it is no doubt easier to identify with an attorney of prominence than with one of lesser repute, we must guard against the temptation to find reasons to treat them differently. The simple truth is that no one knows, or can know, what Harry Sears will or will not do should he re-enter the practice of law. Sears could not know himself. If it is true that he would never transgress again, then the three-year suspension was far too much, if discipline is not to be punitive. But if it is correct to say that discipline includes punishment, that is, the effort to make the penalty "fit" the wrongs, then Sears was treated too leniently. His wrongs were very great. For this reason I believe that the record of the State proceedings virtually requires that this Court consider a greater sanction than a three-year suspension from its Bar. Accordingly, I would convene our own proceedings. I dissent.